# EXHIBIT "2"

Travelers Property & Casualty Company, et al. v.
Brian C. Bossier, et al.

Case No. 2:14-cv-02176-HGB-MBN

# Richard S. Vale

February 26, 2016

# eDeposition Services

(844) 533-DEPO
production@edeposition.com

Richard S. Vale
February 26, 2016

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
CASE NO. 2:14-cv-02176-HGB-MBN

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA AND
ST. PAUL FIRE & MARINE INSURANCE
VERSUS
BRIAN C. BOSSIER AND RICHARD L. OLIVIER AND BLUE
WILLIAMS, LLP AND JOHN DOES 1 THROUGH 10

Videotaped 30(b)(6)deposition of BLUE
WILLIAMS, L.L.P., through its designated corporate
representative, RICHARD S. VALE, taken at the
offices of IRWIN FRITCHIE URQUHART & MOORE, LLC,
400 Poydras Street, Suite 2700, New Orleans,
Louisiana 70130, on Friday, February 26, 2016,
commencing at 9:36 a.m.

Page 2

1                    INDEX
2
                                            Page
3
4    CAPTION...................................1
     APPEARANCES...............................3
5    AGREEMENT OF COUNSEL......................6
     REPORTER'S CERTIFICATE..................206
6
7
8                 EXAMINATION
9    MR. WARREN................................7
10
11
                   EXHIBITS
12
     #153......................................7
13   #154.....................................39
     #155....................................134
14   #156....................................203
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    APPEARANCES:
2
3              Carroll Warren and Parker, PLLC
               BY:  James L. Warren, III, Esquire
4              BY:  Lee Ann C. Thigpen, Esquire
               188 East Capitol Street
5              Suite 1200
               Jackson, Mississippi 39201
6              (601) 592-1010
               Jwarren@cwplaw.com
7              Lthigpen@cwplaw.com
8                   ATTORNEYS FOR PLAINTIFFS
9              Irwin Fritchie Urquhart & Moore, LLC
               BY:  Gustave A. Fritchie, III, Esquire
10             400 Poydras Street
               Suite 2700
11             New Orleans, Louisiana 70130
               (504) 310-2106
12             Gfritchie@irwinllc.com
13                  ATTORNEYS FOR DEFENDANTS
14
     ALSO PRESENT:
15
16             Anna M. Stafford, Esquire
               The Travelers Companies, Inc.
               MS04A
17             One Tower Square
               Hartford, CT 06183
18
               Brian C. Bossier, Esquire
19             Richard L. Olivier, Esquire
               Blue Williams, LLP
20
21
22
23
24
25

Page 4

1    APPEARANCES CONTINUED:
2
     VIDEOGRAPHER:
3
4              Natasha D. Hall
               NDH Media Group, LLC
5
     REPORTED BY:
6
7              CINDY ROGERS LA COUR, CCR, RPR, RMR
               Certified Court Reporter
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Richard S. Vale
February 26, 2016

Page 5

1     S T I P U L A T I O N
2
3         IT IS STIPULATED AND AGREED by and
4     between counsel for the parties hereto that the
5     deposition of the aforementioned witness is hereby
6     being taken under the Federal Rules of Civil
7     Procedure, for all purposes, in accordance with
8     law;
9         That the formalities of reading and
10    signing are specifically not waived;
11        That the formalities of sealing,
12    certification and filing are specifically waived;
13        That all objections, save those as to
14    the form of the question and the responsiveness of
15    the answer, are hereby reserved until such time as
16    this deposition, or any part thereof, may be used
17    or sought to be used in evidence.
18                * * * *
19        CINDY ROGERS LA COUR, C.M., Certified
20    Court Reporter, in and for the Parish of Orleans,
21    State of Louisiana, officiated in administering
22    the oath to the witness.
23
24
25

Page 6

1         THE VIDEOGRAPHER:
2         Today is February 26th, 2016.  The
3     time is approximately 9:36 a.m.  This is the
4     30(b)(6) video deposition of Blue Williams and
5     Brian C. Bossier, case entitled "Travelers, et al
6     versus Brian C. Bossier, et al."
7         Counsel, please identify
8     yourselves for the record.
9         MR. WARREN:
10        Jim Warren for plaintiffs, along
11    with Lee Ann Thigpen.  Anna Stafford is also
12    appearing on behalf of our clients.  Just to be
13    clear, for the record, that this is the 30(b)(6)
14    deposition of Blue Williams as opposed to
15    Mr. Bossier's deposition.
16        THE VIDEOGRAPHER:
17        Okay.
18        MR. FRITCHIE:
19        Gus Fritchie on behalf of the
20    defendants.
21        THE VIDEOGRAPHER:
22        The deponent may be sworn in.
23        THE COURT REPORTER:
24        If you could raise your right hand
25    for me, please.

Page 7

1         Do you solemnly swear the
2     testimony you're about to give shall be the truth,
3     the whole truth, and nothing but the truth, so
4     help you God?
5         THE WITNESS:
6         I do.
7         THE COURT REPORTER:
8         Thank you, sir.
9         RICHARD S. VALE,
10    after having been first duly sworn by the
11    above-mentioned Court Reporter, did testify as
12    follows:
13    EXAMINATION BY MR. WARREN:
14        Q.  Would you state your name, please?
15        A.  Richard Vale.
16        Q.  Mr. Vale, we met before.  I'm Jim
17    Warren.  I represent plaintiffs in this case.
18        My understanding is, is that you
19    have been designated to testify on -- regarding
20    the matters that are indicated in Exhibit #153,
21    which is the 30(b)(6) deposition notice for Blue
22    Williams, LLP; is that correct?
23        A.  That's correct.
24        Q.  Okay.  What is your position at Blue
25    Williams?

Page 8

1         A.  I'm a partner.
2         Q.  Any other designation besides that?
3         A.  Not really, no.
4         Q.  Do you have any management
5     responsibilities for the firm?
6         A.  Yes, I do.
7         Q.  And what are those?
8         A.  I'm on the executive committee.
9         Q.  And how long have you been on the
10    executive committee for the firm?
11        A.  I think since we went to an executive
12    committee.
13        Q.  Some- --
14        A.  Probably about 11, 12 years ago.
15        Q.  And how many members are there on the
16    executive committee?
17        A.  Five.
18        Q.  Is there a chair?
19        A.  No.
20        Q.  Prior to the executive committee
21    format, what was the management format for your
22    firm?
23        A.  We had a management committee of three
24    members, and a comp committee of three members.
25    Management primarily managed the affairs of the

2 (Pages 5 to 8)

Richard S. Vale
February 26, 2016

Page 9

1  firm.  Compensation committee determined
2  compensation for the partners --
3      Q.  Okay.
4      A.  -- and attorneys.
5      Q.  And are those functions all now handled
6  through the executive committee?
7      A.  Correct.
8      Q.  Okay.  Were you on one of the -- the
9  predece- -- predecessor committees?
10     A.  Yes.
11     Q.  Which one?
12     A.  Both.
13     Q.  Both.  Okay.
14     A.  Most of the time.  There was some
15 rotation.  But most of the time, I was either on
16 both or one of them.
17     Q.  You have at- -- you've attended prior
18 depositions in this case?
19     A.  Yes, I have.
20     Q.  And you're familiar with the general
21 subject matter of the litigation?
22     A.  I'm familiar with it to some extent.
23     Q.  In the context of this litigation,
24 you're familiar with it?  In other words, you know
25 that there's -- that there -- I think we're now on

Page 10

1  the second amended complaint.
2          But there's a complaint, an act of
3  complaint in the case, and you're generally
4  familiar with the allegations in that complaint?
5      A.  Yes.
6      Q.  And there's been an answer to that
7  second amended complaint that was filed recently,
8  and you're familiar with the answer and defenses
9  of your firm to the second amended complaint?
10     A.  Yes.
11     Q.  Okay.  The subject matter of the --
12 o- -- of the case -- and you ca- -- if you
13 disagree with what I'm about to say, feel free
14 to --
15     A.  (Affirmative response.)
16     Q.  -- stop me.
17          But relates to litigation that
18 we've referred to at times as the "Marable
19 litigation"?  Would you agree with that?
20     A.  Yes.
21     Q.  Were you personally involved in the
22 Marable litigation in any way?
23     A.  No, I wasn't.
24     Q.  Okay.  So the -- the information that
25 you can provide as the corporate representative of

Page 11

1  Blue Williams, LLP, would be information that you
2  had gained, become familiar with, in the context
3  of this litigation, the current case?
4      A.  Exactly.
5      Q.  All right.  And did you do anything
6  specifically to prepare yourself for this
7  deposition today?
8      A.  I read the notice of the areas of
9  inquiry.  I read the -- or reviewed the pleadings,
10 reviewed the discovery to some extent.  I looked
11 at a couple of the documents that were
12 specifically identified in the 30(b)(6) notice.
13     Q.  Anything --
14     A.  And talked to counsel.
15     Q.  When did Blue Williams, through its
16 executive committee, or otherwise, if there was
17 some other method for doing it, decide to
18 designate you as its representative in this case?
19     A.  I don't know.  I don't know how I
20 became so lucky to get this job.
21     Q.  Ha- --
22     A.  I don't recall.
23     Q.  Has Blue Williams made a decision to
24 designate you as its representative?
25     A.  Yes.  Yes.

Page 12

1      Q.  Okay.  How long have you known that you
2  were gonna be the representative at this
3  deposition?
4      A.  Well, after the litigation began, I was
5  selected to sort of be the firm representative
6  attending depositions and sort of be the liaison
7  between the firm and counsel.  So I've been sort
8  of the designated firm representative since the
9  case began.
10     Q.  And -- and would it -- would it have
11 been your understanding, since the case began,
12 that you were ultimately gonna be the corporate
13 representative when the time came for the firm to
14 testify?
15     A.  Probably.  So long as the inquiries
16 were things that I would be able to respond to.
17     Q.  Yeah.
18          Were -- did -- did you, as a
19 member of the executive committee and as the firm
20 representative in the case, throughout this case,
21 did you ever consider having anyone else appear to
22 act as a representative for some or all of this
23 corporate deposition?
24     A.  I don't know.  I think there was
25 discussions that -- with counsel as strategy as to

Richard S. Vale
February 26, 2016

Page 13

1  whether it should be me or someone else as the
2  firm representative.
3      Q.  And I really don't want to get under
4  your tent as far as your conversations with your
5  counsel.  But I -- I'm just asking, you know, from
6  the Blue Williams perspective, from its
7  management's per- -- perspective, was there ever
8  consideration given to having someone else
9  testify.
10          And I think your testimony is, is
11 considered that possibility, but decided not to go
12 that direction?
13     A.  I think that's basically correct, yeah.
14     Q.  For -- for example, Mr. Bossier is a
15 defendant in the case.
16          Was he considered as a
17 representative?
18     A.  Yeah, I made that suggestion, I think,
19 once or twice.
20     Q.  But that was a selfish suggestion to --
21 to avoid having to spend this time with me?
22     A.  Yes, sir.
23     Q.  Okay.  All right.  You -- you would
24 agree, and -- and -- and by asking this question,
25 I'm not suggesting that there's some rules issue

Page 14

1  here.  I'm just talking practically from a -- from
2  a standpoint of knowledge.
3          You'd agree with me that
4  Mr. Bossier would be more knowledgeable about the
5  Marable litigation than you would be?
6      A.  Absolutely.
7      Q.  Okay.  And then Mr. Olivier would also
8  be more knowledgeable about the Marable litigation
9  than you would be?
10     A.  Absolutely.
11     Q.  Okay.
12     A.  Can I go now?
13     Q.  Well, I'll try to see if I can turn you
14 loose pretty quickly.  Let's -- let's talk in very
15 general terms.
16          There is, in a case like this --
17 and I realize this is very broad, in general, what
18 I'm about to say.  But there'd be a liability side
19 in the sense that -- that in a -- a malpractice
20 case, there would be proof offered by the
21 plaintiff as to mistakes that might have been made
22 or breach in the standard of care, failure to live
23 up to standard of care, however you want to phrase
24 it.
25          And then on the other hand, there

Page 15

1  would be a damages piece.  In other words, you
2  could have a breach without damages, and -- and
3  you also can have damages flowing from a breach.
4      A.  Okay.
5      Q.  Would you agree with those general --
6      A.  Yes.
7      Q.  -- propositions?
8          'Cause you're a lawyer yourself,
9  right?
10     A.  Yes.
11     Q.  For -- on behalf of Blue Williams,
12 would -- would you, in this case, concede that
13 there were breaches on the part of Mr. Olivier in
14 connection with his handling of the Marable
15 litigation?
16     A.  No.
17     Q.  Okay.  And I'm assuming that you'll
18 also say that you would say that even if I can
19 make an argument that there was some breach in the
20 standard of care, that there would be no damages,
21 or the damages should have been mitigated in some
22 other way by Travelers?
23     A.  Yes.  In gen-- yeah.
24     Q.  Well, we're gonna have to spend some
25 time together, then.  I was trying to cut it down

Page 16

1  a little bit.
2          Let's -- let's start by talking
3  about the lawyers that Blue Williams had involved
4  in this case, and I'll try to direct you.  I think
5  that's gonna be No. 18 on #153.  Yeah.
6          Who were the attorneys, the Blue
7  Williams attorneys, who were involved in the
8  defense of the Marable action?
9      A.  Richard Olivier, Brian Bossier.  I
10 believe Tom Buck came in in the later stages or
11 late stages.  Tracy Rotharmel, Laura Gillen, and
12 possibly Erin Boyd.  And -- and maybe this is a
13 good time for me to say something in response to
14 that question.
15          I know nothing about this case
16 other than after the lawsuit or the claim was
17 made, and so I'm gonna be deferring quite a bit
18 through this deposition to say that either
19 Mr. Bossier or Mr. Olivier would be the ones that
20 would really know these points, not -- not the
21 firm.  So to a large extent, I'll be deferring to
22 them on -- on information in connection with the
23 issues in this deposition.  Such as how much
24 Mr. Olivier worked on the file as opposed to how
25 much Mr. Bossier worked on the file and that sort

4 (Pages 13 to 16)

Richard S. Vale
February 26, 2016

Page 17

1 of thing.
2    Q.   Well, before we began the deposition, I
3 inquired of your counsel whether you were -- had
4 been designated on -- to speak on behalf of Blue
5 Williams with respect to all the areas in Exhibit
6 #153, and --
7    A.   Exactly.
8    Q.   -- and he confirmed that you were.
9    A.   Right.
10    Q.   And then I asked you if you were the
11 designee --
12    A.   Yes.
13    Q.   -- and you said you are.
14    A.   Yes.
15    Q.   Okay.
16    A.   For the firm.
17    Q.   Okay.  Well, the firm's a defendant in
18 this action.
19    A.   Correct.
20    Q.   Okay.  Well, I'm not gonna argue with
21 you about whether that's an appropriate approach
22 or not, what you've just described.  I'm gon- --
23 I'm just gonna ask you questions.
24    A.   Okay.
25    Q.   And you can let your -- your -- you can

Page 18

1 make your own decisions about how you want to
2 respond.
3    A.   With counsel.
4    Q.   Yes.
5         And by the way, I -- I -- I'm
6 taking something for granted here, and I think I
7 ought to go ahead and address this right now.
8         You know the rules of the road
9 here as far as giving a deposition, right?
10    A.   Yes.
11    Q.   You've attended a large number of
12 depositions?
13    A.   Yes.
14    Q.   You ever given one before?
15    A.   Yes.
16    Q.   How many times?
17    A.   Once.
18    Q.   Was it a similar situation where you
19 were acting as corporate representative?
20    A.   I think I was the defendant.
21    Q.   What was the case?
22    A.   I'm gonna try to be short on this.
23         I defended an insured several
24 years ago.  The allegation was that the
25 plaintiff's wife, who was also a plaintiff, had

Page 19

1 attempted to change a light bulb in a hotel room
2 and was electrically shocked and went into a
3 vegetative state.  We tried that case in CDC in
4 front of a jury, for three and a half months; and
5 we won, showing that it was a fraudulent claim.
6         For instance -- and that's where I
7 want to be short on this, 'cause you can imagine
8 all the facts in a three-and-a-half-month trial.
9         -- she had been electrically
10 shocked twice before, and each time had gone into
11 a vegetative state; and after the settlement,
12 seemed to have a miraculous recovery.  So we
13 wo- --
14    Q.   A good settlement will do that.
15    A.   Apparently.
16         So we settled that case, and
17 they -- then the plaintiffs' attorneys turned
18 around and then sued me saying that I had hidden
19 evidence and had lied and all that sort of thing.
20 I had to give a deposition.  And then that case
21 was ultimately dismissed as well.
22    Q.   So you gave a deposition in that case.
23         Any other depositions you've
24 given?
25    A.   No.

Page 20

1    Q.   But you've obviously taken a large
2 number of depositions?
3    A.   Yes, sir.
4    Q.   Defended depositions?
5    A.   Yes, sir.
6    Q.   Okay.  S- -- I'm not gonna bother --
7 bother you or bore you with -- with my world view
8 about how -- how we ought to do this.  Let me just
9 say this to you.  Particularly given the fact that
10 you're a corporate representative, if at any point
11 in this deposition you want to stop, confer with
12 your counsel, whatever you want to do, I'll work
13 with you.  And, obviously, this is not an
14 endurance contest.  If you need a break for other
15 reasons, happy to give you that as well.  Okay?
16    A.   Okay.
17    Q.   I realize this is not the most pleasant
18 of situations to be sitting across the table from
19 some lawyer that's suing your firm.  But I will
20 say this to you on a personal level, that you've
21 always been really courteous to me, even though
22 we've been in this position.  I appreciate it.
23 I'm gonna try to return the favor in the way we
24 handle the deposition.
25    A.   Thank you.

5 (Pages 17 to 20)

Richard S. Vale
February 26, 2016

Page 21

1    Q.  All right.  Back to the attor- --
2  attorneys involved.
3        Who was the lead attorney at Blue
4  Williams relative to the defense of the Mar- --
5  Marable action?
6    A.  Richard Olivier.
7    Q.  Was there an associate dedicated to
8  this case to assist Mr. Olivier by the firm?
9    A.  I think Richard could reach out to
10  those associates that were in Brian's practice
11  group for any help.  I don't know if there was one
12  that was his wing man, so to speak, or wing
13  person.  I think he reached out to one or two or
14  three on occasion.  I think he primarily directly
15  handled the case.
16    Q.  You -- you talked about Brian's
17  litigation group.  I -- I think we have had other
18  testimony in this case about the way Blue Williams
19  organized itself.
20        It's -- it's my understanding
21  that -- that Mr. Bossier had his own group of
22  lawyers that worked together on various cases?
23    A.  Practice group or work group.
24    Q.  Right.
25        And in -- in many of those cases,

Page 22

1  I guess including this one, he would be an
2  originating attorney in the sense that he -- a
3  file might come in to him, and then attorneys
4  working in his group would handle the case with
5  varying levels of involvement by him?
6    A.  Correct.
7    Q.  And you yourself are a litigator as
8  well?
9    A.  Yes.
10    Q.  Do you have your own litigation group?
11    A.  Yes.
12    Q.  When -- when the lawyers in a
13  litigation group at Blue Williams are working on a
14  case, are associates used to provide support to
15  lead attorneys as a general rule?
16    A.  Yes.  Yeah.
17    Q.  Okay.  And that support would include
18  briefing or doing research?
19    A.  Yes.
20    Q.  Would it also include assisting the
21  attorney regarding calendaring issues and
22  responses to discovery and making sure that --
23  that the -- the file is -- is maintained and
24  handled in a timely manner?
25    A.  Those were several questions in that

Page 23

1  one.
2    Q.  Yeah.  I -- I -- I'm . . .
3    A.  I -- each group works a little
4  differently.  I think calendaring is either the --
5  the -- the handling attorney, with support from
6  their paralegal, or maybe their secretary if they
7  don't have a paralegal.  Obviously, discovery
8  responses would be handled by the han- -- the --
9  the lead handling attorney with some assistance
10  from an assistant, associate.  And a lot of times,
11  a paralegal as well.  And then it depends on the
12  severity of the case and the kind of case
13  and . . .
14    Q.  So -- so you used the term "lead
15  handling attorney."
16        When I asked you earlier who the
17  lead attorney in the case was, you answered that
18  as if I had asked the question, who the lead
19  handling attorney was in the case?
20    A.  Yeah.  Yeah.
21    Q.  Okay.
22    A.  Yeah.
23    Q.  So it wouldn't matter --
24    A.  It's not --
25    Q.  -- whether we called it "lead attorney"

Page 24

1  or "lead handling attorney."
2        Richard Olivier was the person --
3    A.  Yes.
4    Q.  -- on the Marable case?
5    A.  Yes.  Yes.
6    Q.  I- -- is -- is that terminology that
7  you use, the lead handling attorney, is that
8  personal to you; or is that terminology that would
9  be used within Blue Williams?
10    A.  That might be one of my terms.
11    Q.  Okay.  I- -- if Mr. Olivier, as the
12  lead attorney on the Marable case, needed
13  associate support to defend the case, was he
14  supposed to have it?
15    A.  I don't think anyone would have
16  resisted providing Richard with atever -- whatever
17  resources he needed to defend the cases as long as
18  he felt they were appropriate.
19    Q.  Yeah.
20        Well, in -- was there ever a time
21  when Mr. Olivier did not have the associate
22  resources or other attorney resources that he
23  needed to defend the Marable case?
24    A.  I'm unaware of any time that he did not
25  have the right resources.

Richard S. Vale
February 26, 2016

Page 25

1    Q.   If he had not had the right resources,
2  even though he needed them, whose responsibility
3  would it have been to get him those resources?
4    A.   Well, I would -- would have expected
5  him to talk to Brian, and they would have dealt
6  with that issue.
7    Q.   Here on behalf of Blue Williams, do you
8  know whether Erin Boyd was asked by Mr. Olivier
9  for assistance in defending the Marable case and
10  was unable to provide him that assistance?
11    A.   I don't think the firm would know that.
12  You'd have to ask Richard and/or Erin, which I
13  think you have.
14    Q.   Do you know whether Tracy Rotharmel was
15  ever assigned to provide associate assistance to
16  Mr. Olivier in connectin with the defense of the
17  Marable case?
18    A.   Basically the same answer, I think.  In
19  sitting in depositions, I've heard that.  But as
20  far as the firm knowing, it would really be what
21  Richard and Tracy did or how they worked together
22  that would be able to answer that question for
23  you.
24    Q.   And Laura Gillen, what was her role?
25    A.   She's an associate.  She works in

Page 26

1  Brian's practice group.  So I guess if Richard
2  felt the need to ask her to help in some way, she
3  would do so if -- if she could.
4    Q.   If an associate was being asked -- an
5  associate in Brian's practice group was being
6  asked by both Brian and Richard to do something --
7    A.   On the same case?
8    Q.   No.
9    A.   Two different cases?
10    Q.   In two different cases.
11          But at rel-- -- at -- at -- at or
12  about the same time were being asked to do -- do
13  work, do research, provide assistance, whatever,
14  who's more likely to get the help?
15    MR. FRITCHIE:
16          Objection, form.
17    THE WITNESS:
18          Actually, I would think that our
19  associates are -- are bright enough that they
20  would go to each one and say, "I've got two
21  assignments.  Which one really needs to be done
22  ahead of the other one as far as any time limits
23  are concerned?"  If there wasn't any specific time
24  limits involved, I would assume Mr. Bossier's
25  assignment would get done first.

Page 27

1  EXAMINATION BY MR. WARREN:
2    Q.   And why is that?
3    A.   Because he's senior to Richard and
4  senior partner in the law firm.
5    Q.   Are you aware of ev- -- of Mr. Olivier
6  ever going to anyone who was a partner at Blue
7  Williams and asking for additional resources or
8  assistance in connection with the defense of the
9  Marable action?
10    A.   I don't think the firm would know that
11  other than asking Richard about that.
12    Q.   Why did the firm decide to em- -- get
13  Mr. Buck involved in the case at the late stages?
14    A.   It's my understanding that Tom is one
15  of our best trial attorneys.  He's just -- he's
16  just really good.  And Brian had a conflict with
17  that trial date as he had another trial in another
18  section, I think, of that same court.
19          So Richard needed someone to help
20  second chair the case, so Tom said he would assist
21  in that.  That's my understanding.  So he was
22  gonna second chair with Richard instead of Brian
23  due to Brian's conflict.
24    Q.   Had -- had Mr. Bossier been available,
25  was he -- is it Blue Williams' position that

Page 28

1  Mr. Bossier would have been second chair to
2  Richard in the trial?
3    A.   I think that -- I think that was the
4  understanding, yes.
5    Q.   In early 2014 at the time of this --
6  that this case was getting ready to go to trial,
7  had Mr. Olivier ever tried a case like this?
8    A.   Yes.
9    Q.   What case was that?
10    A.   I mean, he's -- he's had numerous years
11  of trial experience.  I think it was -- dealt with
12  a diver that got lost at sea, and he tried that
13  case in federal court for a week or so.
14    Q.   Any other case you're aware of that
15  Mr. Olivier had tried as of January 2014?
16    A.   I -- I -- I can't recall any off -- off
17  the top of my head.  And -- and -- and I'm not
18  trying to object or anything.  That really wasn't
19  one of the areas of inquiry as to Richard's
20  expertise; otherwise, I would have tried to ask
21  him more about his expertise.  I know he's an
22  experienced trial attorney with, I think, over a
23  hundred jury trials.
24    Q.   How many civil jury trials as of
25  January 2014?

Richard S. Vale
February 26, 2016

Page 29

1      A.  I don't know.  You'd have to ask
2  Richard, which I think you did.
3      Q.  And it's your position that in January
4  2014 -- and I -- by "your," I'm talking about on
5  behalf of Blue Williams -- that Mr. Olivier was an
6  experienced trial attorney in the defense of cases
7  like the Marable action?
8      A.  Yes.
9      Q.  How many cases would -- would you say,
10  as the representative of Blue Williams here today,
11  a lawyer would need to try to be an experienced
12  trial attorney for a case like the Marable action?
13      MR. FRITCHIE:
14           I'm gonna object to that question.
15  That's beyond the scope of the notice.
16           And instruct you not to answer
17  that.
18      MR. WARREN:
19           You're instructing him not to
20  answer?
21      MR. FRITCHIE:
22           It's not in the notice.  He's not
23  here to testify about his personal opinion about
24  things.
25      MR. WARREN:

Page 30

1           No.  He -- he's here to testify on
2  behalf of Blue Williams.
3      MR. FRITCHIE:
4           Correct, and that's not one of the
5  subjects --
6      MR. WARREN:
7           Yeah, it is.
8      MR. FRITCHIE:
9           -- that Blue Williams was asked to
10  testify about.
11      MR. WARREN:
12           It's covered by several of the
13  subjects.
14  EXAMINATION BY MR. WARREN:
15      Q.  Are you gonna follow your attorney's
16  instruction?
17      MR. FRITCHIE:
18           Subject to that, if you can answer
19  it, you can answer it.
20      THE WITNESS:
21           Okay.
22           I'll answer it.  I don't think the
23  firm, in and of itself, has any criteria or
24  requirements as to what the firm would consider to
25  be an experienced trial attorney.

Page 31

1  EXAMINATION BY MR. WARREN:
2      Q.  (Affirmative response.)
3      A.  And I'm not even sure if we asked all
4  the lawyers in this room what an experienced trial
5  attorney means, if we'd get the same definition.
6           I know he had been out 25 or more
7  years.  He had tried a lot of cases.  Especially
8  jury trials.  I know that he's handled a lot of
9  significant exposure cases for the clients at Blue
10  Williams.  And again, he tried a -- another case
11  in federal court with a jury in a pretty
12  high-exposure case, and I -- I believe he -- he
13  got a defense verdict in that one.
14      Q.  In that one case, is that the diver
15  case you're referring to?
16      A.  I think that's the one.
17      Q.  Yeah.
18           Was Mr. Olivier the lead attorney
19  in that case?
20      A.  I don't know.  I -- oh, I think he was
21  the lead attorney for the client, but maybe not
22  the target defendant.
23      Q.  On behalf of Blue Williams here today,
24  are -- are you aware of any behavior of
25  Mr. Olivier, during the time he was involved in

Page 32

1  this Marable action or immediately thereafter,
2  that would cause concern as to his suitability to
3  handle such a case?
4      A.  No.
5      Q.  Are you aware of any periods of time,
6  during the defense of the Marable action, where
7  Mr. Olivier was incapacitated?
8      A.  Again, this is not one of the topics,
9  so I didn't study this.  But, yeah, he had -- he
10  had a heart attack at some point, but I don't know
11  if it was during the Marable litigation.  And I
12  think during the deposition, we learned that he
13  had a kidney stone in August of 2013.
14      Q.  Do you know whether he was hospitalized
15  at any time during the defense of the Marable
16  action?
17      A.  I think he went in to get the -- to
18  pass the stone.
19      Q.  What steps, if any, did Blue Williams
20  take to step in and make sure that the case was
21  being properly defended during the times in the
22  late summer of 2013 when Mr. Olivier was ill?
23      A.  I would assume that Mr. Bossier would
24  be on top of that.
25      Q.  Would that be Mr. Bossier's

8 (Pages 29 to 32)

Richard S. Vale
February 26, 2016

Page 33

1  responsibility?
2       A.  Along with Richard's, yes.
3       Q.  Are you aware of any actions taken by
4  Mr. Olivier, in connection with depositions in the
5  defense of the Marable action, that were unusual
6  or that would be cause for concern?
7       A.  No, sir.
8       Q.  And all my questions to you today are
9  on behalf of Blue Williams, and I -- I think
10  you're aware of that, but -- and so when I'm using
11  the -- the pronoun "you," I'm -- I'm referring to
12  Blue Williams; and you're, obviously, its
13  representative.
14           Are you, as Blue Williams'
15  representative, aware of any issues, as between
16  Mr. Olivier and Mr. Bossier, relative to the way
17  the case should be defended?
18       A.  No.
19       Q.  As Blue Williams' representative here
20  today, are you aware of any occasions, either
21  during the defense of the Marable action or
22  immediately after your firm was terminated or
23  removed from the defense of that action, where
24  Mr. Bossier -- Mr. Bossier -- Mr. Olivier either
25  misrepresented or failed to disclose any material

Page 34

1  facts to either Travelers or to the counsel that
2  succeeded Blue Williams in the defense of the
3  Marable action?
4       A.  No.
5       Q.  Are you aware of any situations, during
6  the course of the defense of the Marable action,
7  where Mr. Olivier misrepresented any facts to
8  opposing counsel?
9       A.  No.
10       Q.  Are you aware of any situations where
11  Mr. Olivier, during the course of the defense of
12  the Marable action, misrepresented any facts to
13  the Court?
14       A.  No.
15       Q.  Had Mr. O- -- Olivier misrepresented
16  facts to Travelers, would that be appropriate --
17       A.  No.
18       Q.  -- in Blue Williams' view?
19       A.  Absolutely not.
20       Q.  If Mr. Olivier misrepresented facts to
21  opposing counsel, would that be appropriate?
22       A.  No.
23       Q.  If Mr. Olivier misrepresented facts to
24  the Court, would that be appropriate?
25       A.  No.  It would be a breach of ethics.

Page 35

1       Q.  And that last thing you just said about
2  breach of ethics, that would apply to any of those
3  misrepresentations, wouldn't it?
4       A.  I believe so, yeah.
5       Q.  Now, Blue Williams was -- was employed
6  by Travelers Companies to defend Empire in the
7  Marable litigation?
8       A.  Yes.
9       Q.  Okay.  And Blue Williams reported to
10  Travelers and to Empire?
11       A.  I believe so.
12       Q.  Yeah.
13           And Blue Williams was aware
14  that -- that if there was a -- a payment that was
15  gonna be made, either by settlement or by way of
16  paying a judgment, that Travelers was gonna be
17  required to pay that?
18       A.  I think we would assume so, yes.
19       Q.  In your answer to the second amended
20  complaint, in your -- I think it's the fourth
21  defense, it's alleged that any losses suffered by
22  the plaintiffs, The Travelers Companies that are
23  plaintiffs in this case, were due to their own
24  fault or neglect.
25       A.  Okay.

Page 36

1       Q.  That's one of the defenses.
2       A.  Okay.
3       Q.  In layman's terms, on behalf of Blue
4  Williams, can you articulate to me what the
5  factual basis for that defense would be?
6       A.  On behalf of the firm, no.  The firm
7  would defer to Richard, Brian and counsel to
8  develop those defenses.
9       Q.  So you can't give me an answer sitting
10  here today?
11       A.  Not for the firm.
12       Q.  With respect to -- would that be true
13  with respect to all the defenses?
14       A.  Yes.  I mean, as you well know, the
15  firm is not a monolithic entity where it has one
16  mind, one body and one soul.  And so the cases are
17  handled by individual attorneys.
18           In this case, Richard was lead
19  counsel.  Brian was in a supervisory capacity.
20  And so as far as what occurred in the Marable
21  litigation, they would be the ones, on behalf of
22  the firm, that would be able to speak to those
23  facts, issues and -- and -- and legal defenses.
24       Q.  Well, under the Rules of Civil
25  Procedure, we've asked for a designee here today;

9 (Pages 33 to 36)

Richard S. Vale
February 26, 2016

Page 37

1    and you are the designee, right?
2        A.  Yes, I am.
3        Q.  And -- and your answer, with respect to
4    the factual basis for the defenses, stated in the
5    answer to the second amended complaint is that you
6    can't give me an answer; other than to say that
7    someone else is -- can answer the question?
8        A.  That's basically true, yes.
9        Q.  Okay.  All right.  Now, you're aware
10   that there have been discovery requests and
11   responses in the course of this litigation?
12       A.  Yes.
13       Q.  You are aware that -- I guess this
14   would have been, what, spring of last year.
15       A.  (Affirmative response.)
16       Q.  Time flies when you're having fun, I
17   guess.  But we had correspondence relative to the
18   collection of various documents in this case.
19           Were you and -- well, let me --
20   let me strike that.
21           One of the areas that we have
22   asked you to testify about here today are the --
23   the documents produced by Blue Williams.
24       A.  Correct.
25       Q.  And there were -- there was a protocol

Page 38

1    for collection of documents at Blue Williams, was
2    there not?
3        A.  Yes, sir.
4        Q.  You were ready for this one.  You
5    brought your own document and everything.
6        A.  I believe that's -- was sent to you.
7        Q.  It was.
8        A.  Okay.  Can I have mine back?
9        Q.  Yeah, I'm gonna give it back to you.
10   I'm just gonna find my tab before I do and make
11   sure we're working off the same document.
12       A.  All right.
13           MR. WARREN:
14               Let's mark this as the next
15       exhibit.
16   EXAMINATION BY MR. WARREN:
17       Q.  I'm gonna mark yours.
18       A.  All right.
19       Q.  I can find you another copy if you need
20   it.
21       A.  Okay.
22       Q.  It's -- there's no writing on there or
23   anything, is there?
24       A.  No, I don't believe so.
25       Q.  Okay.  I'm handing you your document

Page 39

1    that's been marked as Exhibit #154.
2        A.  All right.
3        Q.  Now, in -- in this protocol, beginning
4    on the first page, there are a list of search
5    terms, correct?
6        A.  Correct.
7        Q.  And -- and then later on in the
8    document, there is a statement that this
9    Mr. Campbell, who was charged with the
10   responsibility of executing the searches, failed
11   to search all the search terms.
12       A.  Correct.
13       Q.  How did that happen?
14       A.  I have -- we have no idea.
15       Q.  Who is Mr. Campbell?
16       A.  He was an IT person with our IT vendor,
17   and we -- Mr. Bossier and I met with him in my
18   office one time.  And as we're discussing my role
19   in this, it just -- we looked at the -- the search
20   terms; and he said, "Well, I didn't do all the
21   search terms."  And we couldn't understand why he
22   didn't do it.
23           So I think it was a -- either
24   there was one list, and then somebody added more
25   to the second list, and he never saw the second

Page 40

1    list.  I really don't know, but he had to do the
2    search twice.
3        Q.  Let me try to understand.
4           This IT vendor that you're talking
5    about would have been an IT vendor that Blue
6    Williams would use on -- a- -- as a -- on a
7    regular basis?
8        A.  Yes.
9        Q.  So --
10       A.  PLA, I think is the name.  PLA, I think
11   is the name.
12       Q.  Yeah.
13       A.  They've been with us for a long time.
14       Q.  Okay.  So -- so -- so they would -- is
15   tha- -- that Project Leadership Associates?
16       A.  I -- PLA.
17       Q.  Yeah.  I -- I'm looking at the first
18   page --
19       A.  Oh.
20       Q.  -- of Exhibit #154.  That first full --
21   fir- -- first paragraph, I guess, under "Billing
22   -- Information," it says, "Greg Campbell, an
23   employee of Project Leadership --
24       A.  What page?
25       Q.  Associates?"

10 (Pages 37 to 40)

Richard S. Vale
February 26, 2016

Page 41

1       **First page.  Do you see the**
2   **heading --**
3       A.  Oh, there it is.
4       Q.  -- Billing Information?
5       A.  All right.  "Greg Campbell, an employee
6   of Project Leadership Asso-" -- yeah, I see it.
7       Q.  Okay.  So -- so they're a vendor that
8   would assist your firm on a day-to-day basis with
9   its IT needs?
10      A.  Yes.
11      Q.  Do they still wor- -- work for your
12  firm?
13      A.  Yes.
14      Q.  Okay.  And so you're confronted with
15  some requests for searches of various databases
16  that are under the control of your firm, and you
17  request that your regular IT vendor perform a
18  search?
19      A.  Correct.
20      Q.  Did Mr. Campbell -- di- -- did he have
21  any experience or background in forensic searches
22  or searches that would be used for satisfying
23  obligations to produce ESI in federal court?
24      A.  I have no idea.
25      Q.  Di- -- did Blue Williams select him

Page 42

1   itself to do --
2       A.  I don't think so.  I think the -- our
3   contact person at PLA selected him.
4       Q.  So you let the vendor know what your
5   need was, and then they chose a person to provide
6   that?
7       A.  Right.  And I can't remember his name.
8   I'm pretty sure Brian would recall what the --
9       Q.  Greg Campbell?
10      A.  No.  The fellow at PLA that is our
11  contact person has worked with us and other law
12  firms in this area for quite some time, so I'm
13  pretty sure Mr. Bossier contacted him.  I can't
14  think of his name right off the top of my head.
15  And I think he was the one that selected Greg at
16  that point.
17      Q.  Okay.  And this is something you did
18  yourself; it -- it was -- the -- PLA was not
19  retained by the law firm defending you in this
20  case to do this?
21      A.  No, it was our -- it was our IT
22  company.
23      Q.  (Affirmative response.)
24          An- -- and so he's given the
25  list -- according to the protocol, he's given the

Page 43

1   list of all the search terms, correct?
2       A.  Correct.  Well, that may be where
3   the -- the snafu occurred, that he didn't get the
4   full and final list; he had some prior list.  I
5   don't know.
6       Q.  I -- I'm trying to find in this
7   document that was produced to us in this
8   litigation -- it's actually addressed to me and to
9   the file -- where it says that these search terms
10  may not have been initially provided to
11  Mr. Campbell.
12      A.  That's my supposition talking to Greg.
13  'Cause he had to do it again.  That's a- --
14  that -- that part, I remember.
15      Q.  Yeah.
16          The -- if you turn over to the
17  next-to-the-last page of Exhibit #154 under the
18  heading "Supplemental Production," it says this:
19  It says, "It was later discovered that,
20  unbeknownst to either Blue Williams or Irwin
21  Fritchie, and during the initial data collection,
22  Mr. Campbell used only the following search
23  terms."
24          See that?
25      A.  Yes.

Page 44

1       Q.  But it doesn't say there that he was
2   not provided the -- all the search terms, does it?
3       A.  No.  No.
4       Q.  And here's -- here's the question that
5   occurs to me as I read this memo.
6           If we read the memo, at the
7   beginning, it says that all these search terms
8   were searched.  Then it says they were not
9   searched.  And after that, the same man, who did
10  not search them the first time, was entrusted to
11  do it correctly the second time.
12      A.  Correct.
13      Q.  And what I don't -- what I can't tell
14  from this is -- is how that was checked.
15          What steps were taken to verify
16  that this Mr. Campbell actually conducted the
17  search in the accounts of all custodians and the
18  o- -- other databases using all these search
19  terms?
20      A.  He said he had made a mistake, and he
21  would now do all the terms, and he said he did all
22  the terms.  And I -- I took him at face value on
23  that.
24      Q.  (Affirmative response.)
25      A.  Lee Hovermale.  That's the -- our --

11 (Pages 41 to 44)

Richard S. Vale
February 26, 2016

Page 45

1   PLA.
2       Q.  So the -- so --
3       A.  Lee might have been involved in making
4   sure Greg did it right the second time.
5       Q.  Well, does it say that in this --
6       A.  No.
7       Q.  -- document?
8       A.  No, sir.
9       Q.  This document says that you reviewed
10  the results of the second search.
11      A.  Yes, sir.
12      Q.  Were you reviewing that for relevance
13  purposes?
14      A.  Yes.
15      Q.  Okay.  Did you outsource that to
16  someone working in your group, or did you do it
17  personally?
18      A.  I did it myself.
19      Q.  Okay.  So ho- -- how did you do that?
20      A.  I looked at every document --
21      Q.  Okay.
22      A.  -- that had been collected.
23      Q.  Okay.  And -- and your concern there
24  was -- I guess the obvious concern when you're a
25  law firm and you're producing things -- you didn't

Page 46

1   want to inadvertently produce a document relative
2   to some other client's business in connection with
3   this?
4       A.  Exactly.
5       Q.  Because even though we're adverse to
6   each other in this case, we're all on the same
7   page when most of these documents were produced,
8   and so no secrets between us as to -- as to the
9   defense of the Marable action, right?
10      A.  I'm confused, but . . .
11      Q.  Well, you were -- didn't have a
12  privilege concern as to the Marable action because
13  you were producing the documents to Travelers --
14      A.  Yes.
15      Q.  -- and Travelers' counsel?
16      A.  Correct.
17      Q.  But you didn't want to produce
18  documents that might have had a similar search
19  term in them that might be for an AIG file or --
20      A.  Correct.
21      Q.  -- or for some other defendant or
22  whatever?
23      A.  Or even -- I found a few letters and
24  e-mails to and from Richard and Peter Bloom in
25  other cases that Richard had been handling or was

Page 47

1   concluding for Peter that had nothing to do with
2   Marable, so they were taken out.  And I found on
3   on-- -- one of the lists, someone ordered a pair of
4   shoes from some company on -- on line, and somehow
5   that -- that got snagged in the search.
6       Q.  Well, I'm glad you caught that.
7           The -- the review that you made
8   for relevance and -- and -- and I guess as a
9   subpart of the relevance for privilege, it was not
10  designed to -- to make some technical check of the
11  search to verify that the search was done
12  correctly, was it?
13      A.  Correct.
14      Q.  Okay.  And so --
15      A.  I wouldn't know how to do that.
16      Q.  Right.
17          So the only information that we
18  have that the search was -- was run pursuant to
19  the protocol, and including all of the search
20  terms listed on the protocol, and with all the
21  custodians identified in the protocol, is that
22  Mr. Campbell told you he did that?
23      A.  As far as I -- the information I give
24  you, that's a yes.
25      Q.  All right.  The -- in -- in this

Page 48

1   protocol, there's a reference to passwords.
2       A.  Okay.
3       Q.  And -- and as -- as I read the
4   protocol -- I'm on the second page on the portion
5   just after the list of search terms.  This is
6   Exhibit #154.
7           -- Blue Williams does not maintain
8   for itself a list of user passwords?
9       A.  That's correct.
10      Q.  And so you're dependent on each
11  individual custodian to make their -- for example,
12  their e-mail account, available to you by
13  providing you, if needed, with their password?
14      A.  Or we ask PLA to go in and get it
15  without having to ask the custodian.
16      Q.  Well, when you did this collection of
17  data, according to the protocol, PLA had to ask
18  each of the users for their passwords.
19      A.  I think PLA would have those passwords
20  themselves.
21      Q.  Actually, the protocol says just the
22  opposite, doesn't it?  I'm directing you to the
23  second page just after the list of search terms.
24      A.  All right.  I guess in this case,
25  they -- they asked the custodian for their

Richard S. Vale
February 26, 2016

Page 49

1  password so then they could enter the system. But
2  I'm pretty sure PLA can get into my computer
3  without -- without me telling them my password.
4      Q.  Well, I -- I'm not in a position to
5  argue with you other than what I'm reading in
6  the --
7      A.  Fair enough.
8      Q.  -- in the protocol.
9      A.  Fair enough.
10     Q.  And -- and -- and what I'm reading in
11 the protocol, I'm gonna quote.  I'll -- I'll --
12 I'll try to -- to read it correctly.
13         "As neither Blue Williams nor PLA
14 keeps a record of user passwords, the on-site help
15 desk person, Mitch Landry, who is also a PLA
16 employee, asked each of the target users for their
17 passwords to complete the e-mail collection."
18     A.  Okay.  That's -- must've been how it
19 was done.
20     Q.  All right.
21         And so in order to -- to -- to
22 make this search, that process would have to be
23 completed with each of the custodians?
24     A.  To get their password, yes.
25     Q.  Okay.

Page 50

1          And as described here,
2  Mr. Campbell would log on as each user using their
3  password they provided, and then go into their
4  Outlook and download a local copy of the mailbox,
5  correct?
6      A.  That's -- that's how I understand it,
7  yeah.
8      Q.  And so if he failed to search all these
9  terms, as you've indicated and as the protocol
10 indicates, then in order to go back and search the
11 additional terms, you have to either have written
12 down the passwords, and they stayed the same and
13 used those same passwords; or he'd have to go back
14 to the user to get the passwords, and he'd have to
15 log on to each custodian again and go through the
16 process again?
17     A.  I believe that would be true.
18     Q.  And it's your testimony, on behalf of
19 Blue Williams, that the only information you have
20 to support the assertion that that actually
21 happened is that Mr. Campbell told you he did it?
22     A.  Yes.
23     Q.  Now, if -- and I'm not saying he did
24 this.  I'm just using this as an example, so
25 please -- I don't -- I -- I don't have any

Page 51

1  information about this at all.  This is just an
2  example.
3          But if Mr. Olivier, for example,
4  as part of the defense team, knew that someone
5  was -- was gonna do this process on a certain
6  date --
7      A.  Okay.  All right.
8      Q.  -- and he went in and deleted
9  e-mails --
10     A.  Okay.
11     Q.  -- the day before the process -- you
12 know, there's this one e-mail he didn't want us to
13 see.
14     A.  Okay.
15     Q.  He deleted it.
16         -- what part of this protocol or
17 process would tell us that that had happened?
18     MR. FRITCHIE:
19         Objection to form.
20 EXAMINATION BY MR. WARREN:
21     Q.  If any?
22     A.  I didn't think you could del- -- do
23 that.
24     Q.  I'm asking --
25     A.  And I'm not an IT guy, which is why I

Page 52

1  brought this with me to do the best of my ability,
2  on behalf of the firm, to explain what occurred.
3  I don't -- I don't know if that can be done.
4      Q.  You don't know if you can delete an
5  e-mail?
6      A.  And not have it -- and not have it been
7  searched by PLA when they go in and search all the
8  terms and all the e-mails.
9      Q.  Well, did PLA search the backup?
10     A.  I don't know.
11     Q.  Take a minute with this, and you can --
12 feel free to talk to Mr. Fritchie about it if you
13 want.
14         But do you -- is there anything in
15 this protocol to indicate that the backup drives
16 for each -- for the e-mail accounts were searched?
17     A.  I -- I don't know.
18         I mean, I -- I -- I understand
19 what you're asking and inquiring about, and that's
20 your duty, but I -- we just don't operate that
21 way.  If you ask for something, we're gonna give
22 it to you.
23     Q.  Yeah.
24     A.  So --
25     Q.  I -- I got that.

13 (Pages 49 to 52)

Richard S. Vale
February 26, 2016

Page 53

1    A.  -- I can't even see someone deleting
2  something and then having to go to a backup and
3  all that.  I get your point, but I think that
4  would be highly unlikely.  If not -- no way.
5    Q.  So -- so what -- what you would say to
6  me is, is that -- is that, "We don't operate that
7  way.  We're" -- "We're good, solid people; and" --
8  "and we would" -- "No one in our firm would delete
9  anything, so it's not necessary to -- to check a
10  backup"?
11    A.  I wouldn't go that far, 'cause your job
12  is to make sure that's true.  But we have candor
13  to the Court, and we have obligations.  So if it's
14  asked for and it's discoverable, you know, in my
15  experience with the firm, we gather it and,
16  whether it's good, bad or indifferent, it's
17  produced.
18    Q.  How often have you gone through this
19  process as a firm to produce your documents in --
20  in a federal court litigation where you were being
21  called on to produce ESI?
22    A.  Electronic discovery?  I think this was
23  the first one.
24    Q.  Yeah.  Okay.
25      So when you're talking about what

Page 54

1  your practice is, you had no practice prior to
2  this --
3    A.  Technic- -- technical pra- -- I'm
4  sorry.  I interrupted you.
5    Q.  Yeah.  And -- and, look, I -- I have
6  some -- well, let me say two things.  First of
7  all, the example I gave was not to suggest that
8  anyone did or didn't do anything, and I want to be
9  clear about that.
10    A.  I understand.
11    Q.  I'm just talking about the process and
12  what it would capture and what it wouldn't.
13  And -- and --
14    A.  I get it.
15    Q.  -- you gave me --
16    A.  I get it.
17    Q.  You gave me your answers to that, and
18  I hear -- I heard them.
19      But the other piece to this is, is
20  that -- is that while we, as practitioners, as
21  litigators, very often are interacting with our
22  clients to assist them in gathering ESI at their
23  place of business, okay -- sometimes using an
24  outs- -- outsourced contractor; sometimes using
25  their int- -- in-house IT or whatever -- it's

Page 55

1  different when we're doing it ourselves, right?
2    A.  Absolutely.
3    Q.  And so you may have been involved in
4  ESI-gathering expeditions prior to this one
5  involving clients, but this was the first time
6  Blue Williams had done this for itself?
7    A.  I believe so, yes.
8    Q.  Okay.  All right.
9      MR. WARREN:
10        This is a good breaking point if
11  you want to take just a couple minutes.
12      THE WITNESS:
13        Okay.
14      MR. FRITCHIE:
15        Sure.
16      THE VIDEOGRAPHER:
17        We're off the record.  The time is
18  approximately 10:41 a.m.
19        (Whereupon a recess was taken.)
20      THE VIDEOGRAPHER:
21        We're back on the record.  The
22  time is approximately 10:56 a.m.
23  EXAMINATION BY MR. WARREN:
24    Q.  While we were off, I was thinking about
25  our exchange about, say, for example, the deletion

Page 56

1  of e-mails.  And let me back away from the example
2  of, you know, what if in the context of this --
3  the plan to harvest the e-mails or run the search
4  term, someone, you know, a day or two before
5  decided to delete something.  Let's lay that to
6  the side for a second and just talk about normal
7  course of business at Blue -- Blue Williams.
8      Would you agree with me that
9  without respect to any potential for someday
10  needing to produce an e-mail, or for some future
11  litigation that hasn't happened, just in the
12  day-to-day ordinary course of business, it would
13  be normal for lawyers and others who work for Blue
14  Williams to delete e-mails?
15    A.  Yes.
16    Q.  Yeah.
17      Not necessarily to avoid ultimate
18  production; just, okay, I've read that e-mail, I
19  don't need it anymore, and delete it?
20    A.  Correct.
21    Q.  What happens to that e-mail when --
22  when it's deleted?
23    A.  I wouldn't be able to tell you that.
24    Q.  Do you know whether the search protocol
25  that was utilized in connection with discovery in

14 (Pages 53 to 56)

Richard S. Vale
February 26, 2016

Page 57

1    this case, which is Exhibit #154, was designed in
2    such a way as to identify and collect all deleted
3    e-mails, previously deleted e-mails, that were
4    still available somewhere else in the system, in
5    backup or archive or whatever?
6        A. I don't know. I think it did, but
7    that's my guess.
8        Q. Can you show me in this
9    protocol where --
10       A. No, I can't.
11       Q. -- where it says that?
12       A. No, I can't.
13       Q. Did you ever discuss the need to search
14   backups or archives in the Blue Williams system
15   with your vendor or any employee of your vendor?
16       A. In this case?
17       Q. Yes.
18       A. I don't recall.
19       Q. I notice that the -- that the search,
20   as described in the protocol provided to us, was
21   focused on individual accounts. In fact, if we
22   look at the second page of Exhibit #154 --
23   we've -- we've looked at this previously in
24   another context. But that describes Mitch Landry,
25   the help desk person, asking for passwords, and

Page 58

1    then -- and then it further describes Mr. Campbell
2    logging on to individual accounts.
3            Do you see that?
4        A. Logged on to each user, opened Outlook
5    and downloaded a local copy of each mailbox?
6        Q. Right.
7        A. Okay.
8        Q. Right.
9            Now, is there any description in
10   this protocol, or -- or was there any activity
11   taken that you're aware of that's not in this
12   protocol, to search beyond the individual
13   mailboxes that are identified on Page 1 of Exhibit
14   #154?
15       A. No, sir.
16       Q. How were the individual custodians
17   chosen?
18       A. I believe anyone that possibly had any
19   connexity with the handling of the case.
20       Q. (Affirmative response.)
21           Like, for example, Lauren -- Laura
22   Gillen.
23       A. Doesn't --
24       Q. Was Laura Gillen's?
25       A. Doesn't look like she's on the list.

Page 59

1        Q. Yeah.
2            You're not on the list?
3        A. No, sir.
4        Q. Who were the executive committee
5    members, other than you, at the -- let's say the
6    first quarter of 2014?
7        A. Mr. Bossier, Steve Pizzo, Kurt
8    Blankenship and Virgil Lacy.
9        Q. Did you say "Pizzo"?
10       A. Steve Pizzo.
11       Q. So of those executive committee
12   members, the only one identified is Mr. Bossier?
13       A. Correct.
14           MR. FRITCHIE:
15           Let me see that.
16   EXAMINATION BY MR. WARREN:
17       Q. Are you aware of any e-mail
18   correspondence or written memoranda, whether in
19   electronic or hard-copy form, to or involving the
20   executive committee relative to the Marable
21   litigation?
22       A. There may have been an e-mail or two.
23   But this would have been, obviously, after we had
24   been put on notice of the claim and had retained
25   counsel. And it might have been more of,

Page 60

1    "Mr. Fritchie's coming at 1:00 tomorrow to
2    discuss," stuff like that.
3        Q. So like the -- and we can look more --
4    with more specificity in a moment.
5            But just in general terms, there
6    is this pretrial report goes out to Peter Bloom.
7    Shortly after that, your firm is terminated.
8    Mr. Bossier, I believe, has a conversation with
9    Mr. Bloom at some point in that -- in there. He
10   would have reported to the board -- executive
11   committee relative to this.
12           This is a pretty significant
13   event, is it not?
14       A. Yes.
15           That wouldn't have been in an
16   e-mail --
17       Q. How would that --
18       A. -- or written.
19       Q. -- report have occurred?
20       A. He would have just come ba- -- by and
21   verbally advised us as to what's going on.
22       Q. Did you have regular meetings?
23       A. Yes.
24       Q. What -- when were those meetings?
25       A. The second and fourth Wednesday of

15 (Pages 57 to 60)

Richard S. Vale
February 26, 2016

Page 61

1   every month.  But we would -- you know, we see
2   each other in the hallways or whatever.  And
3   something like that, I'm sure he would have walked
4   it down the hall, as they say, to talk to the
5   others about it.
6        Q.  Did you keep minutes of your regular
7   meetings?
8        A.  Yes.
9        Q.  So if this issue had come up in the
10  context of an executive committee meeting shortly
11  after the -- you were terminated from this case,
12  that would be reflected on the minutes?
13       A.  It would say something, "Discussion
14  regarding Travelers case" or something like that.
15       Q.  (Affirmative response.)
16       A.  If it's there.  It should be there, but
17  I'm not sure if it got to a formal EC meeting
18  early on as opposed to just us all going in
19  Brian's office or my office or someone else's
20  office and discussing it.
21            Those would not be -- there
22  wouldn't be any minutes to a informal meeting.
23  But the two Wednesdays of each month, there are
24  meeting minutes from those.
25       Q.  Did the executive committee, either in

Page 62

1   one of these informal meeti- -- informal meetings
2   that you're talking about or in a formal meeting,
3   ever have any discussions about Mr. Olivier and
4   his involvement in the Marable case, whether he
5   handled it properly?
6        A.  Yeah, what period of time are we
7   talking about?
8        Q.  At any -- at any point.
9        A.  Any time?
10       Q.  Yeah.
11       A.  After we were discharged?
12       Q.  Or during the pendency of the case for
13  that matter.
14       A.  All right.  I know -- I know of nothing
15  during the pendency of the case.  And the only
16  time we would have talked about the handling of
17  the case would have been after we were placed on
18  notice of the claim.  And then with counsel, we
19  reviewed the file, and -- to see what had been
20  done.
21            Does that answer your question?
22       Q.  Well, I -- I -- I'm really not
23  interested in -- in exploring, yo- -- you know,
24  your strategy or tactics that you were gonna
25  utilize to -- to -- to defend the case.

Page 63

1        A.  Okay.
2        Q.  And -- and -- and I -- I respect the
3   privilege there and am not trying to invade it.
4            What I am interested in is whether
5   or not, as a firm, through your executive
6   committee, you -- you ever undertook to review
7   Mr. Olivier's handling of this case to make any
8   decision relative to, you know, counseling him
9   about future --
10       A.  I got you.
11       Q.  -- work or disciplining him or even
12  deciding whether you wanted to keep him on --
13       A.  Got you.
14       Q.  -- you know, whatever?
15       A.  Yes, I'm sure -- I don't specifically
16  recall, but I'm sure we asked Brian, you know,
17  "Have" -- well, "Have you looked at it?  What's
18  going on?  Do you recommend any reprimand or
19  firing or counseling?"  And Brian said he did not
20  see where Bri- -- where Richard had done anything
21  wrong to warrant a reprimand, discharge or
22  counseling.
23       Q.  So -- so if there is a continuum of
24  approach from some sort of conversation about
25  future handling or counseling being a step up from

Page 64

1   that, discipline being a step up from that, being
2   terminated, you know, I guess the ultimate step,
3   the decision, after consultation with Mr. Bossier,
4   was that Blue Williams would take none of those
5   actions, from the slightest to the -- to the most
6   severe?
7        A.  That's correct.
8        Q.  And so would -- would that mean that
9   the executive committee, after hearing from
10  Mr. Bossier, who is also on the executive
11  committee, regarding Mr. Olivier's handling of the
12  Marable action, concluded that he handled the
13  Marable action -- "he" being Mr. Olivier --
14  handled it correctly in --
15       A.  Yes.
16       Q.  -- every respect?
17       A.  Yes.  Well, in every respect, ye- --
18  yes.  Yes.
19       Q.  Has there been any discussion where any
20  of the members of the executive committee,
21  including you and Mr. Bossier, have discussed the
22  possibility of once you get this case concluded,
23  taking some step with respect to Mr. Olivier's
24  continued employment?
25       A.  Because of this case?

16 (Pages 61 to 64)

Richard S. Vale
February 26, 2016

Page 65

1    Q.  For whatever reason.
2    A.  Not because of this case.
3    Q.  Well, because of any other reason?
4    A.  Well, if he was working on the
5  Travelers account, and we don't have the Travelers
6  account, and I think Mr. Bossier's trying to find
7  Mr. Olivier other work.  So there is that
8  contingency one day in the future, if there's not
9  work, then Mr. Olivier may be in jeopardy of
10  continuing to work at Blue Williams.  Although
11  we're gonna do our best to try to keep him 'cause
12  he's a very good attorney, and he's worked for the
13  firm for a long time, and he's just one of the
14  good guys there.  So we're gonna try and do the
15  best to find him work.
16    Q.  Are you saying that his hours are down?
17  Say for 2015, if we look at his hours, are they
18  down?
19    A.  I haven't looked at that.
20    Q.  Were his hours down in 2014?
21    A.  I haven't looked at that.
22    Q.  Okay.  I'm just trying to understand
23  where you're getting this notion that he might be
24  potentially let go because of lack of work?
25    MR. FRITCHIE:

Page 66

1         Jim, I'm gonna ask you, can you
2  tell me in the notice where this is a subject of
3  discussion?
4    MR. WARREN:
5         Well, the -- anything involving
6  Mr. Oliv- -- Olivier, his continued employment, is
7  caught up in our -- our complaint, your answer and
8  defenses to it.  It's the core of the lawsuit.
9    MR. FRITCHIE:
10         I don't see that as a subject to
11  be discussed at his deposition.  I mean, that's --
12  my understanding is, whatever you want to discuss
13  in the deposition has to be laid out in this
14  notice.
15    MR. WARREN:
16         It -- it's in there.
17    MR. FRITCHIE:
18         Can you point it to me?
19    MR. WARREN:
20         Well, it's -- hi- -- his -- his
21  handling of this action is the center piece of --
22  of the case.  And our -- and if you look at our
23  notice, it relates directly to our complaint, the
24  answer, the -- all pleadings filed by you on
25  your -- on -- on your behalf in this matter,

Page 67

1  including your answer, defenses and affirmative
2  defenses.  And in those defenses, you take the
3  position that nothing was done wrong.
4    MR. FRITCHIE:
5         Well --
6    MR. WARREN:
7         Your discovery responses, same
8  thing.  That's number, I believe, 3 on the list.
9    MR. FRITCHIE:
10         But I don't know how that leads to
11  a discussion about Richard Olivier's future with
12  the firm.  That's not --
13    MR. WARREN:
14         It has everything to do with it.
15    MR. FRITCHIE:
16         Well, I mean, I'll allow this to
17  go on a little bit more.  But after -- you know, I
18  just don't see the relevance of it, and I don't
19  think it's contained in the notice.
20  EXAMINATION BY MR. WARREN:
21    Q.  So if you're not familiar with a
22  reduction in hours, what other basis would you
23  have to believe that future lack of work or
24  current lack of work for Mr. Olivier would lead to
25  his -- potentially lead to his term- --

Page 68

1  termination in the future?
2    A.  Well, we're not considering letting him
3  go right now.  But I know that he primarily worked
4  the Travelers account.  We don't have the
5  Travelers account anymore.  So I think Brian is
6  filling him up with other work, and that's as best
7  as I c- -- explanation I can give you at this
8  point.
9    Q.  Well, and -- and -- and let me -- let
10  me ask it again so that we can get it clear one
11  way or the other.
12         As Blue Williams' representative
13  here, you -- are you aware of any discussions,
14  among the members of the executive committee or
15  the partners at Blue Williams, about the potential
16  to terminate Mr. Olivier after this litigation is
17  concluded?
18    A.  No.
19    Q.  Would that mean that -- that you're
20  testifying affirmatively that there have been no
21  such discussions involving any of the partners at
22  Blue Williams?
23    A.  Correct.
24    Q.  I'm -- I've got to go back for just a
25  second to this data search.  And I'm sorry to

17 (Pages 65 to 68)

Richard S. Vale
February 26, 2016

Page 69

1   bother you with it, but I've got to --
2       A.  That's all right.  I'm just not an IT
3   person.
4       Q.  I've just got to kind of --
5           We did not talk about the
6   Interwoven search, but I'm focused now on Page 3
7   of Exhibit #154.
8           In layman's terms, can you explain
9   the query that is -- is in the middle of that
10  page?
11      A.  No, sir.
12      Q.  I'm smiling when I -- when I ask that
13  question.
14      A.  That's all right.
15      Q.  I want to ask a more practical
16  question.
17          Was --
18      A.  I wish I could have -- I wish I could
19  answer it.
20      Q.  Was it your understanding -- was it
21  your understanding that there was supposed to be a
22  search of the Interwoven system for any relevant
23  documents in the same way that the -- or in a
24  similar way that the e-mail accounts were
25  searched?

Page 70

1       A.  Yes.
2       Q.  Okay.  The approach, it looks to me
3   like -- and correct me if I'm wrong.
4           But the approach in Interwoven
5   search was tied to data that was tagged by client
6   and matter number.
7           Is that your understanding?
8       A.  Yes.
9       Q.  So is -- so if -- if a document was put
10  in Interwoven, and it was -- and it was identified
11  by this client, which I think is 426 according to
12  the --
13      A.  Correct.
14      Q.  -- this, and then this matter number,
15  which is 120776, then that would -- the search
16  would have pulled up all the documents so tagged?
17      A.  Correct.
18      Q.  And -- and I guess what I -- what I
19  need to understand, because I -- I'm not familiar
20  with Interwoven -- I think our system has another
21  name, and so --
22      A.  Oh.
23      Q.  -- I don't --
24      A.  Okay.
25      Q.  I think it's similar, but I don't --

Page 71

1       A.  Okay.
2       Q.  -- I -- I don't know it.
3           Would all of the documents that
4   are associated with a particular matter at Blue
5   Williams have both a client and a matter number if
6   they go into Interwoven?
7       A.  They should.  I mean, it just -- as I
8   understand it, it's a piece of paper with the file
9   number on it, which then gets put into an
10  electronic file the same way as it has been in --
11  in paper.
12      Q.  Okay.
13      A.  And, obviously, if it didn't have a
14  file number on the piece of paper, and you're
15  trying to put it into a file, then it's gonna go
16  into, in this case, the 426-120776 file folder.
17      Q.  Are -- are the Interwoven documents
18  time, date stamped when they --
19      A.  Whew.
20      Q.  -- when they go in?
21      A.  I don't know.
22          Ask a young person.
23      Q.  All right.  Wa- -- was the search that
24  was done of the Interwoven documents, was it
25  designed to capture any -- and I'm gonna use the

Page 72

1   term "metadata" for want of a better term.
2           But data associated with how the
3   document got into Interwoven or how it was
4   catalogued in Interwoven?
5       A.  I don't understand your question.
6       Q.  Well --
7       A.  I think they went from some period of
8   time before we got the Marable file in our office
9   to the date we were terminated.  And that was the
10  time period.  I don't know if that a- -- answers
11  your question.
12      Q.  Yeah.  I -- I don't see the -- a date
13  range looking at the document collection.
14      A.  Okay.  I'm pretty sure it was --
15      Q.  I -- I know that the data --
16      A.  -- shortly before the file was opened
17  and then up to the date that we were terminated.
18      Q.  Well, yeah.
19          But -- but -- but that would be
20  driven simply by the existence of the matter
21  number in the sense --
22      A.  Okay.
23      Q.  -- that there wouldn't be a matter
24  number until there was a matter.
25      A.  Okay.

18 (Pages 69 to 72)

Richard S. Vale
February 26, 2016

Page 73

1    Q.  Right?
2    A.  Right.
3    Q.  And -- and -- and while the -- the date
4  range would be important for limiting a search,
5  say, for example, in Outlook, you know, that would
6  cover a much broader area, if the search in
7  Interwoven was tied to a client and matter
8  number --
9    A.  (Affirmative response.)
10   Q.  -- then, by definition, all the
11 documents that would come up would be documents
12 that would be during the existence of that matter?
13   A.  Right.
14        Now, there is a date range for the
15 e-mails.
16   Q.  I understand.
17   A.  And I don't see one --
18   Q.  But I'm not talking about that.
19   A.  I know.  I don't see one for the -- on
20 this memo.  I mean, we could probably find that
21 information out for you, I would think, but I
22 don't know.
23   Q.  Okay.  When -- when -- when I
24 read beginning on the second page of Exhibit #154
25 that's headed "Document Collection," and I read

Page 74

1  through to the top of the next page, what I see is
2  is that there was data in Interwoven, it's
3  extracted into what was believed to be its
4  original file format, whether it was a PDF or a
5  Word doc or whatever.  And I don't see any
6  reference there to capturing the data relative to
7  when a document went into that system.
8        Do you?
9    A.  Okay.  I -- I don't see it on this
10 memo, no.  But I think they just pulled the entire
11 Marable case, 426-20776 [sic].  So whatever was
12 placed in Interwoven would have come back out from
13 this search.
14   Q.  Yeah.  But -- but -- but we're -- but
15 my question goes to a little different issue.
16        If we assume there were 100 Word
17 documents, total, that were put into Interwoven on
18 this particular matter.
19   A.  All right.
20   Q.  Okay.  And if we assume that the client
21 matter numbers were correct on all of them.
22   A.  Okay.
23   Q.  This search would have pulled a hundred
24 documents, right?
25   A.  Yes.  That's my understanding, yeah.

Page 75

1    Q.  Okay.
2    A.  Yeah.
3    Q.  And so -- so we'll lay that -- we'll
4  lay the completeness aside with respect to the
5  documents that were in there.
6    A.  Okay.
7    Q.  And now we'll move on to a different
8  issue.
9        And that is, if the system
10 recorded information about those documents, for
11 example, such as when they were put into
12 Interwoven, I don't see any indication that this
13 search captured that.
14        Do you?
15   A.  I mean, let me try and underst- --
16        So if I got a pleading in today,
17 and I tell my secretary to put it in Interwoven,
18 and two days later is the date that she puts it
19 into Interwoven, you want to know if we have the
20 information to say when it went into Interwoven?
21   Q.  Right.
22   A.  Okay.
23   Q.  You don't know?
24   A.  I have no idea.
25        MR. WARREN:

Page 76

1        #4.
2  EXAMINATION BY MR. WARREN:
3    Q.  And, you know, I'm not interested in
4  how many angels can dance on the head of a pin
5  just for the sake of knowing.  I -- I -- I'm
6  gonna -- I'm gonna hand you a document which will
7  illustrate what I'm trying to find out.
8    A.  All right.
9    Q.  Okay?
10        This is Exhibit #4 that is already
11 in evidence in -- in -- in this matter, and this
12 is a e-mail that was identified by Mr. Olivier.
13   A.  (Affirmative response.)
14   Q.  It's dated October the 22nd.
15   A.  Okay.
16   Q.  And he -- he writes, "Jessica:  I can't
17 find Wayne Marable's answers to Empire's discovery
18 request in Interwoven.  I see it in the discovery
19 folder.  There is a report from his expert that I
20 need to get out to all of our folks.  Thanks,
21 Richard."
22   A.  Okay.
23   Q.  Now, you know why that's significant in
24 this case?
25   A.  Yes.

19 (Pages 73 to 76)

Richard S. Vale
February 26, 2016

Page 77

1    Q.  Okay.  And what I want to know --
2    A.  -- is when that got --
3    Q.  Right.
4         And -- and so the -- and we've
5    asked about this in written discovery and have not
6    gotten a satisfactory answer.  And so now I'm
7    asking you, as the corporate rep --
8    A.  All right.
9    Q.  -- the question.
10        And that is:  You know, first of
11   all, is there data that would indicate when a
12   document gets put in Interwoven; and, second of
13   all, where is it?
14   A.  Okay.
15        MR. FRITCHIE:
16             Objection, form.
17        THE WITNESS:
18             I can't answer that.
19   EXAMINATION BY MR. WARREN:
20   Q.  Okay.
21   A.  No, not even guess.
22   Q.  Do you know whether or not Interwoven
23   is -- the database is word searchable?
24   A.  I think so.
25   Q.  Do you know why search terms were not

Page 78

1    used to search the Interwoven database in the same
2    fashion that search terms were used to search the
3    e-mails?
4    A.  'Cause it -- it would -- to get into
5    Interwoven, you need to have a file number.  And
6    we know which file number these pleadings are and
7    correspondence and -- and material's going to, so
8    they'd all be in that one place.
9    Q.  Well, in some law firm databases -- I'm
10   gonna give you an example --
11   A.  All right.
12   Q.  -- what I'm talking about.
13        If I'm an associate working for
14   you, and you say to me, "File a motion for a writ
15   of replevin" --
16   A.  Whatever that is.
17   Q.  Yeah.  Well, it's -- I'm glad to
18   finally turn the tables on you code lawyers.
19        But I wou- -- I could search that
20   word, "replevin," and it would pull up some Word
21   documents from the database that I could use
22   potentially as a form.
23   A.  Oh.  I think -- yeah, I believe
24   Interwoven can do that.  Yeah.  Yeah.
25   Q.  Yeah.

Page 79

1    A.  Yeah.
2    Q.  And I don't need to know a file
3    number --
4    A.  Right.
5    Q.  -- to do that?
6    A.  Right.
7    Q.  All right.  So I'm asking you is, did
8    you do that, using these search terms in
9    Interwoven, to make sure that all relevant
10   documents were captured?
11   A.  No.
12   Q.  You know, there's a -- if you assume
13   that there is a search made of a -- of a database
14   for documents and that it captures a set of
15   documents that are larger than what you ultimately
16   are going to produce in the case, you might
17   exclude some for relevance for example.
18   A.  Okay.
19   Q.  You might exclude some for privilege --
20   A.  All right.
21   Q.  -- for example.
22        But, ultimately, if you took them
23   altogether, the ones you produce plus the ones
24   that you excluded for relevance and the ones you
25   withheld for privilege, it should equal the -- the

Page 80

1    initial set, right?
2    A.  Yes, sir.
3    Q.  Who was responsible for making sure
4    that that happened in this case with respect to
5    this production?
6    A.  That we counted all the documents in
7    total, both before the search and then after the
8    search.  After we went to determine what was
9    privileged and what might not be relevant, I don't
10   think that was -- I don't think anybody said we
11   had a thousand pages in the beginning, and with
12   what we're producing and what we're not due to
13   privilege and what we're not due to relevancy, we
14   have a thousand again.  I -- I don't think that
15   was done.
16   Q.  Okay.  Now, at some point, this
17   production, which would have included e-mails that
18   would have potentially included some duplicates --
19   you know, John Jones sends an e-mail to
20   Mr. Bossier and to Mr. Olivier, same e-mail, you
21   know; and they're both shown as recipients for
22   ex- -- that's just an example.  But there are
23   obviously other examples.
24        The young lawyers in our office
25   call them "dups," you know, duplicates.

20  (Pages 77 to 80)

Richard S. Vale
February 26, 2016

Page 81

1      A. I get it.
2      Q. Yeah.
3            And so if you have duplicates and
4    that's, for some reason or another, not what you
5    want; then you can dedup it or deduplicate it?
6      A. (Negative response.)
7      Q. You're not familiar with that?
8      A. No. I mean, if it's in the file, it's
9    part of the time.
10     Q. Yeah.
11           Well, actually in -- in --
12     A. We don't dedup.
13     Q. Yeah.
14           Well, actually, you did.
15     A. Did we dedup?
16     Q. Yeah, you did.
17     A. All right.
18     Q. You did. Using a software called
19   "Law."
20           Accor- -- and I -- I'm not trying
21   to trick you or anything. Look at the last page
22   of Exhibit #154.
23     A. The last page?
24     Q. (Affirmative response.)
25     A. Okay. I think what we're saying there

Page 82

1    is that we didn't give you the same documents that
2    had been in that first batch that were found in
3    the second batch, but I'm sure there were --
4    because I saw them -- duplicate e-mails and stuff
5    in both batches.
6      Q. Why dedup at this stage? Why
7    deduplicate at this stage if you ha- -- if you
8    didn't initially?
9      A. Oh, I think it was because it was -- it
10   was an additional search. It wasn't that we were
11   deduping internally inside the file. It was that
12   we searched certain names, got all that stuff
13   together. Then we realized that he hadn't run all
14   the names, so then we -- all the search terms, so
15   then we did that and put them together and somehow
16   decided not to -- to duplicate that effort as far
17   as first batch versus second batch.
18     Q. And who did the quality control on that
19   deduplication to make sure that something that
20   wasn't a duplicate wasn't withheld?
21     A. I don't know.
22     Q. This Campbell fellow that was involved
23   in doing the searches --
24     A. (Affirmative response.)
25     Q. -- do you know what his qualifications

Page 83

1    were?
2      A. No, sir.
3      Q. Do you know if Mr. Campbell had ever
4    done a -- an ESI search for a case in federal
5    court prior to this one?
6      A. I don't know.
7      Q. Did you ever talk to him?
8      A. Yes.
9      Q. Did he ever tell you he had any
10   certificate or any credentials in ESI work?
11     A. No. Not that I recall.
12     Q. And who is Alliance Overnight Document
13   Services?
14     A. I think that's just a copy service.
15     Q. Yeah.
16           They converted documents that were
17   gathered into PDFs and Bates-numbered documents?
18     A. I don't understand your question.
19     Q. I mean, is that right? Is that what
20   they did?
21     A. Is that what this --
22     Q. That's what it says here.
23     A. If that's what it says, then I'm gonna
24   defer.
25     Q. I'm gonna ask you a follow-up question.

Page 84

1    I was just trying to get a starting point. I --
2    I'm sorry. I -- I -- I'm on the third -- the
3    fourth page of Exhibit #154.
4      A. All right.
5      Q. Under "Transfer of Data."
6      A. All right. All right.
7      Q. So did I state that correctly, that was
8    what -- that was the task that was accomplished by
9    Alliance Overnight Ser- -- Document Service?
10     A. Apparently through the auspices of
11   Mr. Fritchie.
12     Q. Oh, okay.
13           So you guys use your IT vendor to
14   collect these documents. Then a -- that results
15   in a drive?
16     A. Yeah, they call it something.
17     Q. A thumb drive?
18     A. Yeah, USB drive.
19     Q. Yeah, that were --
20           That was provided to
21   Mr. Fritchie's IT person, Ray Kaufman, correct?
22     A. Apparently.
23     Q. And then he gives it to Alliance?
24     A. Apparently.
25     Q. Had you worked with Alliance Overnight

Richard S. Vale
February 26, 2016

Page 85

1  Document Services before?
2      A. I don't, no.
3      Q. And to circle back to the deduplication
4  issue that we're talking about, while it doesn't
5  appear that deduplication was done in this first
6  transfer of data, when the s- -- when the
7  additional search terms were utilized, and it was
8  sent out again to Mr. Fritchie's firm, it went
9  again to Alliance, and -- and it was Alliance that
10 accomplished this so-called "deduplication"?
11     A. That's what it says, yeah.
12     Q. Okay.
13     A. So I was right, we don't dedup.
14     Q. You didn't do it in house for sure,
15 right? It was done somewhere else?
16     A. Right.
17     Q. Okay. You ever seen an e-mail string?
18     A. Yeah. I hope that's not a trick
19 question.
20     Q. No, I'm trying to get a starting place.
21     A. Yes.
22     Q. So like -- let's just say it's
23 Mr. Bossier and I, we're going back and forth. So
24 I send him an e-mail on Monday morning; and Monday
25 afternoon, he replies to me. And then Tuesday, I

Page 86

1  reply back to him. Wednesday, he replies back to
2  me. So you can sometimes like a string where
3  you've got a conversation going with five or six
4  exchanges, maybe even more.
5      A. Right.
6      Q. Are you familiar with all of what I'm
7  talking about?
8      A. Yes. Yes.
9      Q. For each one of --
10     A. I know that much.
11     Q. Yeah. Yeah.
12        For -- for each of those e-mails
13 back and forth --
14     A. All right.
15     Q. -- that would ultimately make up the
16 string, there's a separate e-mail in my outbox and
17 his inbox, right?
18     A. Right.
19     Q. And so if I see a string, going back to
20 my example where I sent an e-mail to him on Monday
21 morning. Maybe had a attachment with it. Maybe
22 not. But I send him an e-mail on Monday morning;
23 he writes me back; we go back and forth.
24        If I -- i- -- if he produces in
25 discovery later to somebody that e-mail string

Page 87

1  that's -- where maybe the latest message is on
2  Thursday, and it's got five or six messages tied
3  up --
4      A. Okay.
5      Q. -- that would mean that also in his
6  inbox, there should be that original e-mail from
7  me on Monday?
8      A. Yes.
9      Q. Right?
10     A. Right.
11     Q. And if I look at the production, and I
12 see that e-mail string and maybe one on Wednesday
13 and maybe one on Tuesday, but there -- but the one
14 on Monday isn't there, that would suggest that it
15 was deleted, right?
16        MR. FRITCHIE:
17           Objection to the form.
18        THE WITNESS:
19           I guess so, but I'm really not the
20 one to -- I don't know if sometimes they get
21 hooked up into that chain or not. I don't know.
22 EXAMINATION BY MR. WARREN:
23     Q. Well, when I send him an e-mail on
24 Monday --
25     A. I think you should be able to go back

Page 88

1  and click on each e-mail.
2      Q. Right.
3      A. And -- and then you'll see the last one
4  has the whole chain. But I don't -- I'm not --
5  I'm not trying to resist or avoid your questions,
6  but I am not an IT person. And that's why I
7  brought this memo, because if I didn't have my
8  cheat sheet, I wouldn't have been able to tell
9  most of what I've already told you.
10     Q. I think you've done fine. I think --
11     A. So . . .
12     Q. And I appreciate you being patient with
13 me.
14        Did anyone check this production
15 to see if there were any e-mails that were
16 obviously missing?
17     A. I don't -- no. I don't think so.
18     Q. When did Blue Williams first receive a
19 copy of Charlie Miller's April 15th, 2013, report?
20     A. Other than the information that
21 Mr. Olivier would be able to provide you or
22 Mr. Bossier would be able to provide you, the firm
23 has no independent knowledge of that.
24     Q. In preparing for your deposition today,
25 did you take any steps to determine the answer to

22 (Pages 85 to 88)

Richard S. Vale
February 26, 2016

Page 89

1  that question?
2      A.  No, sir.
3      Q.  You knew I was gonna ask you, didn't
4  you?
5      A.  It was in the inquiries, correct.
6      Q.  Right.
7          But you also knew because of the
8  nature of this case -- you've been sitting through
9  these depositions -- you --
10     A.  Oh, it's an issue.
11     Q.  Yeah.
12     A.  Absolutely.
13     Q.  Yeah.
14     A.  But the firm, again, doesn't ha- -- the
15  firm didn't handle this case.  The firm didn't
16  take the depositions.  The firm didn't file the
17  pleadings.  The firm didn't exchange e-mails.
18  Mr. Olivier, while handling the case, did that;
19  and, Mr. Bossier, in his supervisory capacity, did
20  that.  And that's why they would know it.  And for
21  me as the firm, we have no other knowledge than
22  what they know.
23     Q.  Well, if you wanted to interview
24  Miss Militello, would you have been free to do
25  that?

Page 90

1      A.  Yes.
2      Q.  She still work for the firm?
3      A.  (Affirmative response.)  Yes.
4      Q.  She gave a deposition in this case.
5          Is that transcript of that
6  deposition available to you?
7      A.  Yes.  Once again, that -- that would be
8  her information.  That wouldn't be anything
9  independent or in addition that the firm would
10  know other than what she testified to.
11     Q.  I -- I'm not gonna accept or reject
12  what you just said.  I'm just gonna --
13     A.  Fair enough.
14     Q.  -- let it sit there --
15     A.  Fair enough.
16     Q.  -- and I don't want to argue with you.
17          I- -- if you had wanted to
18  interview Mr. Olivier about this issue of when
19  Blue Williams first received the Charlie Miller
20  April 15th, 2013, report, you could have done
21  that, couldn't you?
22     A.  Yes.
23     Q.  But you didn't?
24     A.  Correct.
25     Q.  Same thing for Mr. Bossier?

Page 91

1      A.  Correct.  They -- they can speak for
2  themselves.
3      Q.  No, but I'm -- I'm -- I'm talking about
4  in preparing yourself to give this deposition
5  today.
6          You could have interviewed either
7  or both of those gentlemen, couldn't you?
8          MR. FRITCHIE:
9              Objection to the form.
10         THE WITNESS:
11             Yes.
12  EXAMINATION BY MR. WARREN:
13     Q.  And a number of documents have been
14  produced in this case that bear on this issue of
15  when the April 15th, 2013, report was received by
16  Blue Williams, correct?
17     A.  Yes.
18     Q.  And you could have reviewed any or all
19  of those documents?
20     A.  Yes.
21     Q.  But you didn't?
22     A.  Correct.
23     Q.  And Interwoven, for example, Interwoven
24  either does or doesn't have some date and time
25  stamp --

Page 92

1      A.  Okay.
2      Q.  -- right?
3      A.  Correct.
4      Q.  You could have found that out and
5  checked Interwoven to see when that report was
6  first placed in Interwoven, couldn't you?
7          MR. FRITCHIE:
8              Objection, form.
9          THE WITNESS:
10             I'm not sure I would have been
11  able to do that; but I could have asked someone
12  else, possibly, to do that.
13  EXAMINATION BY MR. WARREN:
14     Q.  And you did not?
15     A.  Correct.
16     Q.  Documents were produced by the Duplass
17  firm that were once in possession of your firm.
18          My understanding is a substantial
19  mart of -- part of the litigation file was just
20  sent over to Duplass when the case --
21     A.  I think the whole file was --
22     Q.  Yeah.
23     A.  -- sent over to Duplass.
24     Q.  Well, I -- I won't debate that with
25  you.

Richard S. Vale
February 26, 2016

Page 93

1    A.  All right.  All right.  I -- I hear
2  you.  All right.
3       Q.  Yeah.
4            But --
5       A.  My impression was, from what we
6  understand, the whole file was sent to Duplass.
7       Q.  Yeah.  Yeah.  You need to -- to talk to
8  Mr. Trapolin about what a file is --
9       A.  Okay.
10      Q.  -- before you commit on that.  I'll
11  just say that.  He has different views --
12      A.  All right.
13      Q.  -- about that.
14           But in an- -- but in any event,
15  you could have reviewed the -- the discovery
16  binder, for example, from this file --
17      A.  Yes.
18      Q.  -- in preparation for this deposition?
19      A.  Yes.
20      Q.  But you didn't, did you?
21      A.  No.
22      Q.  And when you said "no," you're agreeing
23  with me you did not?
24      A.  I did not look at the -- file.
25      Q.  And so you've come to this deposition,

Page 94

1  where it's -- you -- you clearly kn- -- knew, both
2  from the actual words of the notice plus your
3  understanding of what's going on in this case,
4  what the issues are in this case, knowing I was
5  gonna ask you when Blue Williams first received
6  Charlie Miller's April 15th, 2013, report; and you
7  had the resources available to -- to discover the
8  answer to that question, right?
9       A.  Well, I --
10      MR. FRITCHIE:
11           Objection to form.
12      THE WITNESS:
13           -- would have been able to review
14  the file, but I don't know if -- go ahead.  I'd
15  have been able to review the file.
16  EXAMINATION BY MR. WARREN:
17      Q.  No.  You were able to do a lot more
18  than that.
19      A.  All the oth- -- all the other things
20  you said.
21      Q.  Yes.
22      A.  Yes.
23      Q.  Yes.
24           And you chose not to do any of
25  that?

Page 95

1       A.  Because Mr. Olivier had already given
2  you all of the information on that subject, and
3  there was nothing new, different or that I could
4  add to it.  And so my answer is what Mr. Olivier
5  said and what I expect Mr. Bossier to say on that
6  subject.
7       Q.  Did your --
8       A.  The firm has no independent additional
9  knowledge than what they have.  So if I went and
10  did all that, it would be an arduous task to try
11  and then memorize everything that Mr. Olivier
12  knows or what Mr. Bossier knows.  The firm, in and
13  of itself, doesn't have that knowledge.
14      Q.  Well, you realize, sir, that -- that
15  I'm not asking you to memorize anything; I'm just
16  asking you --
17      A.  Well --
18      Q.  -- to tell me when you received the
19  report.
20      A.  Well, you -- Richard's already answered
21  that question.
22      Q.  And what was his answer?
23      A.  He doesn't know exactly.
24      Q.  On behalf of Blue Williams, was the
25  report received at least prior to October the

Page 96

1  22nd, 2013, at 10:46 p.m.?
2       A.  Which report?
3       Q.  The April 15th, 2013, Charlie Miller
4  report.
5       A.  I think there was some iteration of a
6  report that was received in October.  I think the
7  facts pretty much bear that out.
8       Q.  It was rece- -- it was received in
9  October?
10      A.  By October.
11      Q.  Yeah.  By October.
12      A.  By October.
13      Q.  Yeah.
14           So it would be your position, as
15  Blue Williams' representative, that at least by
16  October 22nd, 2013, Blue Williams had received the
17  Charlie Miller April 15, 2013, report?
18      A.  But not the final report as required
19  or -- if it had been required by 1425.  'Cause
20  there was nothing attached to it.
21      Q.  Well, what I'm talking about is a
22  signed letter, report, from Charlie Miller dated
23  April 15th, 2013, which states his opinions
24  relative to the Marable suit.
25      A.  I think you asked Mr. Olivier that

24 (Pages 93 to 96)

Richard S. Vale
February 26, 2016

Page 97

1   question.
2       **Q.  I'm asking you, though.**
3       A.  I would defer to Mr. Olivier.
4       **Q.  Well --**
5       A.  How would the firm know that?
6   Mr. Olivier would know that.
7       **Q.  Well, I -- I'm -- I'm not asking you to**
8   **go back in time and have the firm know it in**
9   **October of 2013.**
10      A.  Okay.
11      **Q.  I'm asking you in the context of this**
12  **litigation now, as the corporate representative**
13  **designated pursuant to Rule 30(b)(6) at our**
14  **request, to state your position on this factual**
15  **issue?**
16          MR. FRITCHIE:
17      And he has.  He's deferring to
18  Mr. Olivier.
19          MR. WARREN:
20      Come on now.  Let -- let's let --
21          MR. FRITCHIE:
22      Well.
23          MR. WARREN:
24      -- your representative --
25          MR. FRITCHIE:

Page 98

1       If we're gonna go around this,
2   we're gonna go through this on every question, he
3   can tell you that.  But I'm just trying to
4   short-circuit.
5           MR. WARREN:
6       Well, no, you're not.  Because
7   you're engaging in some sort of gamesmanship here
8   that is not helpful to the process.
9           MR. FRITCHIE:
10      I -- I totally disagree with that.
11  And if you want to bring that to the Court's
12  attention, let's do it.  I -- this is not
13  gamesmanship.  The firm is under no obligation to
14  go memorize this file to respond to this
15  deposition.  The firm knows what the firm knows.
16  What the firm knows is what these witnesses know.
17  You've deposed Mr. Olivier for seven hours.  God
18  knows how long you'll be with Mr. Bossier.
19      The firm has no obligation -- and
20  it's my position -- to go back and memorize that
21  information and regurgitate it to you in a
22  corporate deposition.  If you disagree with that,
23  let's go talk to the judge.  That's my position.
24          MR. WARREN:
25      An- -- and you don't have anything

Page 99

1   else you want to give me on that?
2           MR. FRITCHIE:
3       That's it.
4           MR. WARREN:
5       Okay.  Well, we will make what I
6   hope is a mature and responsible decision relative
7   to how we're gonna proceed when we get through
8   asking the questions that we've come here to ask.
9   I'm not interested in going over to visit with the
10  judge orally.  We're gonna -- we -- we will -- we
11  will, first of all, confer with you in good faith.
12  And, second of all, if we can't resolve our
13  differences, we will frame them in a written
14  document and present them to the Court and ask for
15  the relief we think we're entitled to.
16          MR. FRITCHIE:
17      Fine.
18          MR. WARREN:
19      That's what we're gonna do.
20          MR. FRITCHIE:
21      That's good.
22          MR. WARREN:
23      But bef- -- but before I asked
24  these questions today, I had no idea what position
25  you were taking.  You had not advised me that you

Page 100

1   were gonna take this approach.  Had you so advised
2   me, we might have framed it up prior to being here
3   today.
4       All you did is -- first of all,
5   you didn't respond to my e-mail yesterday when I
6   asked who would be the representative.  But you
7   did -- were kind enough to tell Lee Ann at the
8   hearing yesterday.  And I didn't know before
9   yesterday Mr. Vale was gonna be the
10  representative.  I assumed it was gonna be
11  Mr. Bossier.  But silly me.
12      So there was no way to get this
13  resolved in advance is my point.  Now, you knew
14  this, but -- but --
15          MR. FRITCHIE:
16      My position is we're responding
17  the way we're required to under the law.  And --
18  and we can talk about this after the deposition,
19  but my position is we're doing what we're required
20  to do under the law.
21          MR. WARREN:
22      Well, if you can do this, if you
23  can do what you're doing, what it will mean is is
24  that a Rule 30(b)(6) deposition has no meaning
25  whatsoever.  And you're under no obligation to

25 (Pages 97 to 100)

Richard S. Vale
February 26, 2016

Page 101

1    review your own documents, your own records, talk
2    to your own people and -- when responding.  And --
3    and my experience has been that corporate
4    defendants cannot get away with that.  That's been
5    my experience.  But we will see whether you're
6    able to.
7         MR. FRITCHIE:
8              Okay.  All right.
9         MR. WARREN:
10             Why don't we take a break for
11   just a second and I'll try to get back focused,
12   and . . .
13        THE VIDEOGRAPHER:
14             We're off the record.  The time is
15   approximately 11:51 a.m.
16             (Whereupon a lunch recess was
17   taken.)
18        THE VIDEOGRAPHER:
19             We're back on the record.  The
20   time is approximately 1:02 p.m.
21   EXAMINATION BY MR. WARREN:
22        Q.  Mr. Vale, I want to try to understand
23   Blue Williams' position relative to this -- the
24   receipt of the Charlie Miller report from the
25   standpoint of its management of the attorneys that

Page 102

1    worked for it.
2             Now, Mi- -- Mr. Olivier is an
3    employee of the firm?
4         A.  Yes.
5         Q.  He's not a partner?
6         A.  He's not an equity partner.
7         Q.  He's not an owner?
8         A.  Not an owner.
9         Q.  Yeah.
10             So he's an employee?
11        A.  Yes.
12        Q.  He receives a -- a W-2?
13        A.  Yes.
14        Q.  Okay.  And you -- you're interested in
15   the attorneys who work for your firm in -- in
16   making sure that they do their job correctly and
17   that they are honest in their dealings with cl- --
18   clients and opposing counsel and the Court, right?
19        A.  Correct.
20        Q.  If the documents in your possession,
21   and interviews of, say, staff members, or even a
22   review of a deposition of a staff member, or other
23   information that's available to you, would
24   indicate that your employee had not been candid
25   about his handling of a particular file, would

Page 103

1    that be important information for your firm to
2    know?
3         A.  Yes.
4         Q.  Okay.  And have you made a detailed
5    review of your file materials and interviewed all
6    relevant employees to determine whether or not
7    Mr. Olivier has been candid relative to his
8    receipt of Charlie Miller's April 15th, 2013,
9    report?
10        A.  Mr. Bossier's done an evaluation, and
11   we have discussed this with our counsel, and we
12   see nothing that Mr. Olivier did that was
13   inappropriate or a -- an intentional
14   misrepresentation of the facts.
15        Q.  In December of 2013, a motion to
16   continue the Marable trial was -- was filed.
17             Are you aware of that?
18        A.  Yes.
19        Q.  And in that motion, there was a
20   representation that no expert report had been
21   received?
22        A.  Yes.
23        Q.  If there was correspondence in your
24   e-mail server that showed that, in fact, a report
25   had been received that was contrary to the

Page 104

1    representation made in that motion, would that not
2    be important to you as a firm in evaluating
3    whether or not your employee was discharging his
4    duties correctly?
5         A.  I don't --
6         MR. FRITCHIE:
7              Objection to form.
8         THE WITNESS:
9              I don't think it was contrary to
10   the facts of the case.  He had not received the
11   file -- first of all, 1425 absolutely did not
12   apply in this case requiring expert reports.
13   That's Rick Vale.  Number 2, at the time that he
14   filed that pleading, he was alluding to the fact
15   that he had not received a final report per 1425,
16   which he hadn't at that point in time.  So he
17   wasn't misrepresenting anything when he filed that
18   pleading.
19        MR. WARREN:
20             I'll object and move to strike the
21   nonresponsive portion of the witness' answer.
22   EXAMINATION BY MR. WARREN:
23        Q.  So now -- now, Blue Williams has a
24   position --
25        A.  Now?

26 (Pages 101 to 104)

Richard S. Vale
February 26, 2016

1    Q.  -- relative to the receipt of the
2  report?
3    A.  No.  I'm still deferring to Richard and
4  Mr. Ol- -- Bossier on those points.  We don't have
5  an independent knowledge of what these
6  professionals did with the ha- -- in the handling
7  of this case.
8    Q.  Okay.  So when you just --
9    A.  I defer to them.
10    Q.  When you just told me that the
11  representation made in December in the motion to
12  continue was not inconsistent with earlier
13  correspondence from Mr. Olivier relative to the
14  Charlie Miller report, you're not telling me that
15  based on your firm's knowledge and understanding?
16    A.  That's not what I'm saying.  His
17  representation in that pleading was that he had
18  not received a report from Charlie Miller.  And
19  it's my understanding that what he meant by that
20  is he had not received a final report that is
21  requir- -- when required under 1425, which
22  includes all of the supporting documentation for
23  that report.
24        I think that's what he has said in
25  his deposition.  And we defer to him on that a- --

1  a- -- as far as his pleadings and the arguments
2  that he was making in those pleadings.
3    Q.  Has Blue Williams reviewed the motion
4  to continue that was filed in December 2013, and
5  specifically the representations made therein
6  relative to the nonreceipt of expert reports, to
7  determine whether or not the -- those
8  representations were accurate?
9    A.  I -- yes.
10    Q.  So you have done that analysis?
11    A.  I reviewed the pleadings.
12    Q.  Okay.  And did you review the other
13  documents available to you to determine whether or
14  not it -- the representations were true?
15    A.  Well, I talked to Richard, while
16  counsel was present, about that.
17    Q.  So for -- for you to -- and have you
18  determined that the representations relative to
19  the nonreceipt of expert reports that's in that
20  motion to dismiss that was fi- -- I mean motion to
21  continue that was filed in December was true?
22    A.  We do not believe Mr. Olivier made any
23  misrepresentations in that pleading.
24    Q.  Okay.  So -- so that would mean that --
25  that however you've done it and whoever you talked

1  to about it, you have now made a factual
2  determination that as of the filing of the motion
3  to dis- -- motion to continue in December of 2013,
4  the Charlie Miller report dated April 15th, 2013,
5  had not been received?
6    A.  That's not what I'm saying.
7      MR. FRITCHIE:
8        Objection to the form.
9      THE WITNESS:
10        That's not what I'm saying.
11  EXAMINATION BY MR. WARREN:
12    Q.  Well, how would you then know whether
13  or not the representation was accurate?
14    A.  By talking with Richard Olivier.
15    Q.  The guy who wrote the motion?
16    A.  Right.
17    Q.  So you got a motion that makes a
18  representation regarding nonreceipt of expert
19  reports, and the sum total of your investigation
20  to determine whether that's accurate or not is to
21  talk to the guy that wrote the motion?
22    A.  And his explanation was reasonable to
23  me that he did not misrepresent any facts in that
24  pleading.
25    Q.  You made a -- you made a statement a

1  moment ago relative to the operation of 1425 in
2  the context of this case?
3    A.  (Nods head affirmatively.)
4    Q.  Do you know whether or not, in the
5  scope of Mr. Olivier's work on this Marable file,
6  whether or not he made any statements relative to
7  the applicability of 1425 in this case?
8    A.  I believe there's e-mails, letters, on
9  that subject within his file.
10    Q.  And do you know whether or not, in some
11  cases, statements regarding the applicability of
12  1425 were made with the knowledge and agreement of
13  Mr. Bossier?
14    A.  I think there's one e-mail where
15  Mr. Bossier's actually disagreeing with Richard
16  regarding an interpretation of the app- --
17  application of 1425.
18    Q.  Do you know whether or not there were
19  any reports made -- or a report made to Travelers
20  relative to the applicability of 1425 that were
21  first passed by Mr. Bossier before they were sent?
22    A.  I don't know that to -- you'd have to
23  ask one of those gentlemen.
24    Q.  Prior to -- let's just say prior to
25  December of 2013.

27 (Pages 105 to 108)

Richard S. Vale
February 26, 2016

Page 109

1    A.  Okay.
2    Q.  **What was Blue Williams' position**
3  **relative to the applicability of 1425 in the**
4  **Marable action as stated by the lead attorney,**
5  **Mr. Olivier?**
6         MR. FRITCHIE:
7             Objection to the form.
8             Subject to it, you can answer.
9         THE WITNESS:
10            The firm has no opinion on the
11  application of 1425 'cause the firm doesn't, on
12  its own, practice law.  The attorneys who practice
13  law are the ones that have opinions.  And,
14  therefore, each attorney has their own, hopefully
15  consistent, professional opinion in this case with
16  respect to the application of 1425.
17            So the -- the firm doesn't have
18  knowledge of that.  It's solely the attorneys that
19  would have knowledge of the application of 1425.
20  EXAMINATION BY MR. WARREN:
21    Q.  **In connection with your preparation for**
22  **giving your deposition in this case, have you**
23  **interviewed the attorneys, reviewed their**
24  **commun- -- written communications, to determine**
25  **what their position was relative to the**

Page 110

1  **applicability of 1425 prior to December of 2013 in**
2  **the Marable action?**
3    A.  After discussions with counsel, we
4  couldn't figure out how we could ever get that
5  done.
6    Q.  **So you haven't done that?**
7    A.  Correct.
8    Q.  **And so you can't answer the question as**
9  **posed; and that is, what was the position of the**
10  **attorneys at Blue Williams defending the Marable**
11  **action relative to the applicability of 1425 prior**
12  **to December of 2013?**
13    A.  The firm can't.  They can.
14    Q.  **Would you agree with me that there are**
15  **statements made about it in the file?**
16    A.  1425 is discussed in the file.  Yes.
17    Q.  **Would you agree with me that**
18  **Mr. Olivier's position on the issue changed at**
19  **some point?**
20    A.  I think you'd have to ask Mr. Olivier
21  that, which I believe you have.
22    Q.  **So here as the representative for Blue**
23  **Williams, can you tell me whether or not**
24  **Mr. Olivia's -- Olivier's position regarding the**
25  **applicability of 1425 changed at some point,**

Page 111

1  either in late 2013 or early 2014?
2    A.  The firm wouldn't know that.
3    Q.  **And you have not taken any steps to**
4  **determine that through review of documents or**
5  **interviewing witnesses?**
6    A.  Correct.
7    Q.  **Have you reviewed the -- the pretrial**
8  **order in -- in the Marable case, this Exhibit #9?**
9    A.  I don't think I have.  I mean, I've
10  s- -- I might have seen it; but, no, I have-- I
11  don't think I've really re- -- reviewed it.
12         MR. WARREN:
13             I'm sorry.  I gave you the wrong
14  number. #10.
15  EXAMINATION BY MR. WARREN:
16    Q.  **Earlier I said Exhibit #9, and I should**
17  **have said #10.  Apologize.**
18         MR. FRITCHIE:
19             You called this a "pretrial
20  order"?
21         MR. WARREN:
22             It -- I may be using the wrong
23  term.  It is -- looks like a scheduling order.
24         MR. FRITCHIE:
25             Correct.  I think that's what it's

Page 112

1  called.
2         MR. WARREN:
3             Yeah.
4  EXAMINATION BY MR. WARREN:
5    Q.  **Okay.  So let me -- let me go back and**
6  **clean up.**
7            **Have you reviewed the scheduling**
8  **order in this case that is Exhibit #10?**
9    A.  I do not believe I have reviewed it.
10    Q.  **I'm gonna hand it to you.**
11    A.  All right.
12         MR. WARREN:
13             You got a copy?
14         MR. FRITCHIE:
15             I got a copy.
16         MR. BOSSIER:
17             Thank you.
18  EXAMINATION BY MR. WARREN:
19    Q.  **You have Exhibit -- Exhibit #10 in**
20  **front of you now?**
21    A.  Yes, sir.
22    Q.  **Do you see the reference to expert**
23  **reports?**
24    A.  Yes, sir.
25    Q.  **And the language that says, "See LA.**

28 (Pages 109 to 112)

Richard S. Vale
February 26, 2016

Page 113

1    CCP, Article 1425(C)"?
2        A.  Correct.
3        Q.  On behalf of Blue Williams, can you
4    tell me what that reference in this scheduling
5    order means or meant in the context of the Marable
6    case?
7        A.  The firm wouldn't have any additional
8    knowledge or independent knowledge other than what
9    Mr. Olivier or Mr. Bossier might have had with
10   respect to that issue.
11       Q.  Can you tell me what the position of
12   Empire Truck Sales, or its counsel in the Marable
13   litigation, took relative to the -- the meaning of
14   that language and the applicability of 1425(C) in
15   the Marable litigation?
16       A.  The firm would defer to Mr. Olivier and
17   Mr. Bossier on that issue.
18       Q.  You see the writing out beside that?
19       A.  Check marks, I think, or -- and the
20   date something.
21       Q.  Yeah.
22       A.  It's hard to read.  I don't see -- I
23   see a check mark and something.  "11-4" or "4."  I
24   don't know.
25       Q.  "11-4 is 90 days"?

Page 114

1        A.  I --
2        Q.  "Or 90 days"?
3        A.  -- are you asking me is 11-4 ninety
4    days, or --
5        Q.  Well, I see --
6        A.  -- what does it say?
7        Q.  -- an "11-4," and then I see "90 days,"
8    and I'm not sure whether it's "or" or "is."
9        A.  Oh, I see what -- you're asking me is
10   that what it says?
11       Q.  Yeah.
12       A.  It looks like it.  Yeah.  It's really
13   bad on my copy.  I don't know if yours is any
14   better.
15       Q.  I -- I don't think it is.
16       A.  Okay.
17       Q.  So . . .
18           Do you know who wrote that on this
19   scheduling order?
20       A.  No, I don't.
21       Q.  Have you taken any steps to determine
22   who -- who wrote that?
23       A.  I believe Mr. Olivier knows and
24   would -- would be able to testify about that if he
25   hasn't already.

Page 115

1        Q.  And what has Mr. -- what has
2    Mr. Olivier told you?
3        A.  Outside of presence of counsel,
4    Mr. Olivier and I haven't had many discussions at
5    all about this case.
6        Q.  Well -- well, you're here as a
7    representative of Blue Williams, and I'm asking
8    you what you -- what you know about this.  If you
9    learned who wrote that from Mr. Olivier, I'd be
10   entitled to know.
11       A.  And I'm saying the firm would have to
12   defer to Mr. Olivier on that point.  The firm
13   doesn't have any independent knowledge of that.
14       Q.  But what did he tell you?
15       A.  I don't recall.  It was probably during
16   meetings with counsel.
17       Q.  Did Blue Williams calendar any
18   deadlines relative to expert reports?
19       A.  No.
20       Q.  You sure about that?
21       A.  Blue Williams didn't calendar anything.
22   Mr. Olivier may have calendared some things;
23   Mr. Bossier may have calendared some things; Rick
24   Vale may have calendared some other things in
25   other cases, not Marable.  But Blue Williams

Page 116

1    doesn't calendar anything.
2        Q.  So you're saying that if Miss Militello
3    or Mr. Olivier or Mr. Bossier, or some combination
4    of those three people, entered a -- a reminder in
5    for a particular date or dates relative to expert
6    reports into your calendaring system at Blue
7    Williams, that that would not be the firm doing
8    it; it would be just these people doing it?
9        A.  It would be them doing it on behalf of
10   their clients within the firm, yeah.
11       Q.  That would be the firm, wouldn't it?
12       A.  Yes, it would.
13       Q.  Okay.  So now I'm asking you again.
14           Did the firm calendar any
15   deadlines relative to -- or deadlines or
16   reminders -- I'm not sure they're even different,
17   but I'll use both words -- relative to expert
18   reports --
19       A.  And my an- --
20       Q.  -- in connection with the Marable
21   action?
22       A.  I'm sorry.  And my answer's the same:
23   No.  Mr. Olivier and his staff entered deadline
24   dates.  And Mr. Bossier may, with his staff, enter
25   deadline dates on behalf of the firm.

Richard S. Vale
February 26, 2016

Page 117

1      Q.   Okay.  Did that happen in the Marable
2  case with respect to expert reports?  Do --
3  were -- were deadlines or reminders entered?
4      A.  I don't know.  You'd have to ask
5  Mr. Olivier.
6      Q.   Prior to coming here today, did you
7  take any steps to check your records to determine
8  whether reminders or deadlines had been entered?
9      A.  No, sir.
10     Q.   Did you interview anyone to make that
11  determination?
12     A.  No, sir.
13     Q.   When the Charlie Miller report was
14  provided by e-mail in December from plaintiffs'
15  counsel to Mr. Olivier, do you know whether or not
16  Mr. Olivier set up a deadline for filing any
17  rebuttal or contradictory report as a result of
18  that event?
19     A.  I don't know.  You'd have to ask
20  Mr. Olivier.
21     Q.   So Blue Williams, as represented by you
22  here today testifying in this 30(b)(6) deposition,
23  can offer no opinion on that issue?
24     A.  That's correct.
25     Q.   Have you taken any steps to find out?

Page 118

1  Did you interview anybody?
2      A.  No.  I -- again, I've talked to
3  Mr. Olivier on numerous occasions about this case,
4  but most of the time in -- in the presence of our
5  counsel, to learn about the case.
6      Q.   Whenever the plaintiffs are provided
7  the Charlie Miller report, did that trigger any
8  requirement on the part of Empire, through its
9  attorneys, to produce and serve a rebuttal or
10  contradictory report if they intended to rebut or
11  contradict the expert report?
12     A.  Can you ask --
13         MR. FRITCHIE:
14         Objection to form.
15         THE WITNESS:
16         Can you ask that one again?  I got
17  lost.
18  EXAMINATION BY MR. WARREN:
19     Q.   You know, we've -- we've been hung up
20  on when the report came in, okay.  Lay that aside.
21  Let's assume that the Charlie Miller report is
22  produced at some point --
23     A.  Okay.
24     Q.   -- in this case.
25         Did that trigger any requirement

Page 119

1  that a rebuttal or contradictory report be served
2  within a certain amount of time?
3         MR. FRITCHIE:
4         Objection, form.
5         THE WITNESS:
6         Yeah, I would defer to Mr. Olivier
7  and Mr. Bossier on that.
8  EXAMINATION BY MR. WARREN:
9      Q.   So coming here today, you've not taken
10  any steps to determine their position?
11     A.  Other than in the presence of counsel.
12     Q.   I -- it doesn't matter to me what --
13  where it happened.
14         You're a corporate representative,
15  you've been properly noticed to come and testify
16  on these issues, and I'm asking you your position?
17     A.  And my position is you're gonna have to
18  ask Mr. Olivier or Mr. Bossier.
19     Q.   So -- so Blue Williams is not going to
20  offer an answer to the question?
21     A.  Not Blue Williams.  Mr. Bossier and
22  Mr. Olivier will present the facts on those
23  issues.
24     Q.   You're aware that Blue Williams is a
25  defendant in this case?

Page 120

1      A.   Yes.  I believe because Mr. Olivier
2  works for us, and Mr. Bossier is a partner in our
3  law firm.  I didn't see any inde-- -- any
4  independent acts of negligence, per se, against
5  Blue Williams, the law firm.
6      Q.   Well, under your theory, Blue Williams
7  can't know anything, can't do anything and doesn't
8  really exist, I mean, right?
9         MR. FRITCHIE:
10         Wait.  No.  Excuse me.  Let me
11  object to the argumentative nature of the
12  question.
13         MR. WARREN:
14         No, that --
15         THE WITNESS:
16         Besides this is not relevant.  The
17  firm is going to be vicariously liable for any
18  actions of its attorneys.  It's not relevant.
19         MR. WARREN:
20         It is in-- -- incredibly relevant.
21  You know why.
22         MR. FRITCHIE:
23         I do not know why.  I don't
24  understand even the point of this deposition.
25  I -- in -- in 20 years of doing defense work for

Richard S. Vale
February 26, 2016

Page 121

1  lawyers, I have never had a firm deposed in a
2  corporate deposition.  Ever.
3          MR. WARREN:
4              Well, that may be why you handled
5  it so poorly.  But --
6          MR. FRITCHIE:
7              You can -- you can characterize it
8  in any way you which [sic].  We're wasting time,
9  though.  I think if you just ask the questions,
10  we'll get through the notice, and you can do
11  whatever you have to do at that point.
12          MR. WARREN:
13              Right.  Right.
14              Let me have Exhibit #9.
15  EXAMINATION BY MR. WARREN:
16      Q.  I'm gonna hand you a document that's
17  been marked as Exhibit #9.
18          MR. BOSSIER:
19              Thank you.
20          MR. FRITCHIE:
21              I got it.
22  EXAMINATION BY MR. WARREN:
23      Q.  If you turn to the second page of
24  Exhibit #9, there's an e-mail there from
25  Mr. Olivier to Peter Bloom at Travelers; and it's

Page 122

1  copying Brian Bossier and -- and Miss Militello as
2  well.  And if you look at the -- I guess it's the
3  third paragraph, the second indented paragraph,
4  there's a reference to this pretrial order.
5          And this is what it says.  It
6  says, "You will note the Court's new pretrial
7  order has the same provisions regarding expert
8  reports and defers to LA. CCP, Article 1425(C),
9  which requires a contradictory motion by any party
10  in order to mandate that any party retaining an
11  expert be required to provide a written report of
12  same as directed by the Court, or in default at
13  least 90 days prior to trial.  Any report intended
14  to rebut such a report is due 30 days following
15  the receipt of the report."
16          Did I read that correctly?
17      A.  Yes.
18      Q.  Okay.  Now, does Blue Williams take
19  issue with that interpretation as stated in -- on
20  the second page of Exhibit #9?
21          THE WITNESS:
22              Should I answer that one?
23          MR. FRITCHIE:
24              You can answer it the same way
25  you've answered previous questions.

Page 123

1          MR. WARREN:
2              I'd object to counsel coaching the
3  witness.  I -- I think counsel can object.  If
4  counsel wants to object, the witness needs to
5  answer.
6          MR. FRITCHIE:
7              Well, I just object that it's
8  repetitive.
9          MR. WARREN:
10              It's the first time that we've
11  ever looked at this exhibit, and --
12          MR. FRITCHIE:
13              The question is repetitive.
14          MR. WARREN:
15              No, it's not.
16          THE WITNESS:
17              And I'm sorry.  I -- can -- could
18  she read it back?
19  EXAMINATION BY MR. WARREN:
20      Q.  I -- I can -- I -- I read you the --
21      A.  Yeah, I know what you did.
22              What was the question?
23          MR. WARREN:
24              Read it back to him, please.  You
25  can -- you don't have to read him the portion that

Page 124

1  I read.  Just he -- he needs to know my question
2  based on --
3              Is that si- -- is that okay with
4  you?
5          THE COURT REPORTER:
6              Question:  "Now, does Blue
7  Williams take issue with that interpretation as
8  stated on the second page of Exhibit #9?"
9          THE WITNESS:
10              I really don't think the firm has
11  a position on it.  You'd have to ask the
12  professionals handling the case as to their
13  opinions.  I mean, the -- we're a professional
14  partnership, so the -- the firm doesn't have this,
15  again, monolithic knowledge of these issues.
16              So I would defer to Mr. Olivier
17  and Mr. Bossier on this point.
18  EXAMINATION BY MR. WARREN:
19      Q.  So you're unwilling to state a position
20  as to whether the portion of Exhibit #9 I read to
21  you is a correct statement of the -- the
22  application of the scheduling order in 1425(C) to
23  the Marable case?
24          MR. FRITCHIE:
25              Objection to the form.  He didn't

31 (Pages 121 to 124)

Richard S. Vale
February 26, 2016

Page 125

1    say that.
2         THE WITNESS:
3              It's because I can't.  'Cause
4    the -- the firm doesn't have a legal knowledge of
5    the application of this Code of Civil Procedure
6    article.  The attorneys would.
7    EXAMINATION BY MR. WARREN:
8         Q.  You -- there's gonna come a time when
9    we're gonna be at trial, okay?
10        A.  (Affirmative response.)
11        Q.  And if -- if you're gonna take a
12   position on this issue at trial, I'm entitled to
13   hear it from you now.
14        A.  Oh, absolutely.  I agree with you
15   there.
16        Q.  So you realize you may be forfeiting
17   your ability to -- to take a position?
18        A.  I -- well, you mean the firm, not the
19   attorneys for the -- on behalf of the firm.
20   Well --
21        Q.  And I'm not --
22        A.  I'm not gonna admit or deny what risks
23   I'm taking.
24        Q.  As -- well, and -- and I'm -- I'm
25   unwilling to concede you can take this position.

Page 126

1         A.  Fair enough.
2         Q.  Okay.  But I'm just saying if you are
3    successful in it, at the very least, you may not
4    be able to -- to offer any testimony on this
5    issue.
6         A.  Is that a question or is --
7         Q.  I'm not --
8         A.  -- an admonition?
9         Q.  A little of both.  It's more of a
10   statement.
11        MR. BOSSIER:
12            Let's move on, guys.
13        MR. WARREN:
14            Well, I think it's -- I think it's
15   worth getting it on the table what we're --
16        MR. BOSSIER:
17            We don't need your advice, with
18   all due respect.  We understand.
19        MR. WARREN:
20            No, I'm -- it's my position.  It's
21   not my advice.
22        MR. BOSSIER:
23            Oh, I thought you were giving us
24   advice.  I'm sorry.
25        MR. WARREN:

Page 127

1              Look, I wouldn't -- I -- far be
2    it for --
3         MR. BOSSIER:
4              It sounded like you wanted to make
5    sure we understood it, this was the risk.  We
6    don't need that, but thank you.
7    EXAMINATION BY MR. WARREN:
8         Q.  Was Travelers entitled to know about
9    the receipt of the expert report at some point
10   prior to -- that occurred some point prior to
11   October 22nd and be given advice as to the
12   advantages and disadvantages of not filing a
13   contradictory or a rebuttal report within 30 days?
14        MR. FRITCHIE:
15            Jim, can you direct me to the
16   section of the notice that asks him to discuss
17   that?
18        MR. WARREN:
19            What are you talking about?
20        MR. FRITCHIE:
21            What Travelers was entitled to.
22        MR. WARREN:
23            Well, I mean, that -- that's what
24   our complaint's about.  I mean, it's . . .
25        THE WITNESS:

Page 128

1              I'm waiting on my counsel.
2         MR. WARREN:
3              Okay.
4         MR. FRITCHIE:
5              If -- under Category 17, you asked
6    Blue Williams to testify regarding "communications
7    between you and Travelers regarding the Marable
8    action, including the status of the case,
9    liability assessments and case valuation."  You
10   don't ask him what was Travelers entitled to.  You
11   ask him what were the communications.
12        MR. WARREN:
13            I'm not necessarily relying on 17.
14   That's part of this issue, the communications, and
15   it's a setup to that.  But --
16        MR. FRITCHIE:
17            And regardless, that's also
18   calling for a legal conclusion too.
19        MR. WARREN:
20            Well, there -- but we're entitled
21   to know a law firm's position as to what its legal
22   obligations were to a client in a malpractice
23   action.
24        MR. FRITCHIE:
25            A law firm is bound by the actions

32  (Pages 125 to 128)

Richard S. Vale
February 26, 2016

```
                                    Page 129
 1   of its attorneys.  If you can prove that its
 2   attorneys violated some law or some ethical
 3   provision or violated the standard of care, the
 4   law firm is going to be responsible for that.  Why
 5   the law firm has to voice an independent opinion
 6   of something is irrelevant.
 7           MR. WARREN:
 8           Well, but I'm -- I'm ent- -- this
 9   is discovery.  I'm entitled to ask the question.
10           MR. FRITCHIE:
11           Object to the form.
12           Subject to it, you can answer.
13           THE WITNESS:
14           Yeah.
15           Well, I completely forgot what you
16   asked me.  I'm sorry.
17           MR. FRITCHIE:
18           Was Travelers entitled to know
19   what the --
20           THE WITNESS:
21           Oh, before.
22           Travelers is entitled to receive
23   information regarding the handling of the file,
24   which would include all pleadings, expert reports,
25   options.  Should be a -- a flow of information to
```

```
                                    Page 130
 1   the client so they could be kept abreast of what's
 2   going on so they can make the decisions they need
 3   to make.
 4           Does that answer your question?
 5   EXAMINATION BY MR. WARREN:
 6       Q.  It's helpful.
 7           If -- if we assume that the report
 8   was sent over on or about September the 6th, 2013,
 9   and that at some point subsequent to that, it was
10   discovered that it was included in some discovery
11   responses that were provided on that date, counsel
12   becomes aware of it, and we'll say in October, at
13   least.  And there's the potential that that
14   earlier service had triggered some responsibility
15   to file a rebuttal report.
16           If we assume all that's true,
17   would Travelers be entitled to be notified of the
18   issue and consulted regarding what the next be- --
19   next step should be?
20       A.  Am I supposed to respond to a hypothet?
21           MR. FRITCHIE:
22           Objection to the form that it
23   calls for a hypothet.
24           Subject to it, you can answer the
25   question if you can.
```

```
                                    Page 131
 1           THE WITNESS:
 2           I mean, I -- I'm not an expert in
 3   this case, and you've just set forth facts that I
 4   may or may not agree with.  So, again, I go back
 5   to the fact that, yes, Travelers should expect to
 6   receive timely information regarding the handling
 7   of the case, the legal issues, the facts, and --
 8   in order to be kept abreast of the case so they
 9   can make the decisions they need to make.
10   EXAMINATION BY MR. WARREN:
11       Q.  Can -- can you tell me what benefit was
12   provided to Travelers by not serving a rebuttal
13   report once Mr. Olivier realized that he had the
14   Charlie Miller report in October?
15           MR. FRITCHIE:
16           Objection to the form.
17           THE WITNESS:
18           Yeah, you'd have to talk to
19   Mr. Olivier and Mr. Bossier about that.  I have no
20   facts regarding that as the firm.
21   EXAMINATION BY MR. WARREN:
22       Q.  Was there the potential at that point
23   for the Court to conclude that if Empire wanted to
24   contradict or rebut the Charlie Miller report, it
25   had to do it within 30 days of rece- -- receipt?
```

```
                                    Page 132
 1           MR. FRITCHIE:
 2           Objection to form.
 3           THE WITNESS:
 4           You'd have to ask Mr. Olivier
 5   and Mr. Bossier.
 6   EXAMINATION BY MR. WARREN:
 7       Q.  So Blue Williams has no -- no position
 8   on that?
 9       A.  Correct.
10       Q.  And you have not taken any steps,
11   through interviewing witnesses or looking at
12   documents, to determine whether there was
13   potential for the Court to make that
14   determination?
15       A.  I've had many discussions with counsel
16   about that.
17       Q.  And what is your conclusion?
18       A.  That that's the discussion --
19           MR. FRITCHIE:
20           Objection.  Don't answer that.
21           THE WITNESS:
22           -- we've had with counsel.
23           MR. FRITCHIE:
24           Don't answer that.
25   EXAMINATION BY MR. WARREN:
```

33 (Pages 129 to 132)

Richard S. Vale
February 26, 2016

Page 133

1      Q.  I don't want to know about the
2  privileged discussions.
3              What I want to know is your
4  position here in this deposition?
5      A.  As to whether 1425 applied in this case
6  or not?
7      Q.  Or pot- -- potentially could have been
8  found to apply by the Court?
9      A.  I think the firm believes strongly that
10  1425 was not triggered in this case requiring the
11  production of expert reports or re- -- therefore,
12  rebuttal reports.
13      Q.  And what is the basis for that belief?
14      A.  The facts that Mr. Olivier and
15  Mr. Bossier have provided in -- in this case and
16  for which Mr. Olivier has already testified.
17      Q.  What are those facts?
18      A.  I don't recall them off the top of my
19  head.  I can point to Mr. Olivier's deposition
20  and, soon, the deposition of Mr. Bossier.
21      Q.  Well, no.  Those are long -- that's one
22  long document --
23      A.  Yeah, exactly.
24      Q.  -- that already exists and one -- one
25  that's going to.

Page 134

1              But give me a -- the basic facts
2  that would support your belief that 1425 was not
3  triggered in -- in this case.
4      A.  'Cause it's quite clear 1425 req- --
5  says that expert reports are not required unless
6  there's a contradictory hearing requiring them or
7  by the Court's own motion requiring them.  Neither
8  one of those took place in this case.  Therefore,
9  they didn't apply.  And -- you know.
10      MR. WARREN:
11          Let me have #262.
12          The next exhibit.
13      MS. THIGPEN:
14          Yeah.
15  EXAMINATION BY MR. WARREN:
16      Q.  Okay.  I'm gonna hand you what's been
17  marked as Exhibit #155.  I think this is 1425.
18  Let's see.
19          Okay.  If you look back at Exhibit
20  #10, you see the scheduling order with respect to
21  expert reports says, "See LA. CCP, Article
22  1425(C)"?
23      A.  Okay.
24      Q.  Did I read that correctly?
25      A.  "See LA. CCP, Article 1425," parens,

Page 135

1  "C," close parens, correct.
2      Q.  Right.
3              That refers to the language in
4  Paragraph C of 1425, which is Exhibit #155,
5  correct?
6      A.  I -- I assume so.
7      Q.  Okay.  What is -- now that you've told
8  me that the firm has a position that the 1425 was
9  never triggered in this case, first, I want you to
10  explain to me what was the purpose, as understood
11  by the firm, for the reference to expert reports
12  and 1425(C) in the scheduling order.
13      A.  You'd have to ask Mr. Olivier or
14  Mr. Bossier.
15      Q.  So you don't know that?
16      A.  That's correct.
17      MR. FRITCHIE:
18          Let me make a belated objection to
19  the form of the question insofar it calls for a
20  legal conclusion too.
21  EXAMINATION BY MR. WARREN:
22      Q.  And you have not --
23      MR. FRITCHIE:
24          Re- -- regardless of what anybody
25  in this case thinks that means, it's up to the

Page 136

1  judge to decide what it means.
2      MR. WARREN:
3          No one's trying to invade the
4  province of the Court to give legal instructions.
5  I'm simply trying to get understanding relative to
6  the defense of this case.
7  EXAMINATION BY MR. WARREN:
8      Q.  If we look at 1425(C), there is a
9  reference to, "If the Court orders the disclosures
10  of Paragraph B, they shall made att" -- "be made at
11  the times and in the sequence directed by the
12  Court."
13              You see that?
14      A.  (Affirmative response.)
15      Q.  Is that -- is your understanding of
16  that that if -- if the Court says they'll be done
17  by a certain date, that the parties have to follow
18  the Court's directive?
19      MR. FRITCHIE:
20          Objection to the form.
21      THE WITNESS:
22          I don't think the firm has an
23  opinion on that.  I think you'd have to ask the
24  individual professional handling that.
25  EXAMINATION BY MR. WARREN:

34 (Pages 133 to 136)

Richard S. Vale
February 26, 2016

Page 137

1    Q.  Well, with -- an- -- and I want to be
2  as collegial as I can be here --
3    A.  Okay.
4    Q.  -- and get along with you as much as I
5  can be.  But you've taken a position now that it
6  wasn't triggered.  And then when I'm trying to --
7  to -- to understand the basis for the position,
8  you're not -- you're not answering any questions.
9    A.  That's right.  I'm saying talk to
10  Mr. Olivier or talk to Mr. Bossier.  They will
11  provide the facts on that.  But based on what
12  they've said in meetings with counsel, the firm
13  does not believe 1425 was triggered.  But as far
14  as the legal opinions and all of the issues
15  relating thereto and the application of the
16  pretrial order, Mr. Olivier and Mr. Bossier would
17  be the ones to answer those questions for you, not
18  the firm.
19    Q.  Okay.  The firm recognizes that C says
20  that, "In the absence of directions from the Court
21  or stipulation by the parties, the disclosures
22  ordered pursuant to Paragraph B of this article
23  shall be made at least 90 days before the trial
24  date."
25      Do you see that?

Page 138

1    A.  I s- -- I see it, yes.
2    Q.  Okay.  So 1425(C) has a provision that
3  addresses a default approach if the Court does not
4  order specific timing for the disclosures; is that
5  correct?
6      MR. FRITCHIE:
7        Objection to the form.
8  Misstate -- you misstate --
9      THE WITNESS:
10        Yeah, that's not what it says.
11      MR. FRITCHIE:
12        -- the substance of the article.
13      THE WITNESS:
14        That's not what it says.
15  EXAMINATION BY MR. WARREN:
16    Q.  Do you know --
17      MR. FRITCHIE:
18        And you're being argumentative
19  too.  This is a legal issue.  Why we have to -- to
20  be deposed about this is beyond me.
21      MR. WARREN:
22        Because you're lawyers, and you
23  were -- and -- and this is a legal malpractice
24  case, and I'm entitled to explore the
25  understanding of the firm relative to the handling

Page 139

1  of the case.  That's the reason.  And so I'm not
2  gonna interact with you anymore about this.  I'm
3  gonna go forward.  You do what you have to do,
4  okay?
5  EXAMINATION BY MR. WARREN:
6    Q.  Do you know whether or not Mr. Olivier
7  referred to this default provision relative to 90
8  days before trial and then contradictory reports
9  30 days later?  Do you know whether he referred to
10  this in his dealings with counsel opposite, in his
11  dealings with the client, his dealings with
12  Mr. Bossier?
13    A.  I believe there was correspondence,
14  e-mails, communication in the file on this issue.
15    Q.  Right.
16    A.  Correct.
17    Q.  And -- and Mr. Olivier took the
18  position that -- that the plaintiffs' reports,
19  pursuant to 1425 and the scheduling order, were
20  required to be served at least 90s days before
21  trial?
22    A.  I don't know.  You'd have to ask
23  Mr. Olivier.
24    Q.  And you've not taken any -- any steps
25  to review the documents -- we're talking facts

Page 140

1  now, not law; we're talking facts -- to determine
2  whether Mr. Olivier took that position during the
3  course of the Marable case?
4    A.  And I said that there are e-mails on
5  that subject, yes.
6    Q.  Do you agree with me that in those
7  e-mails, Mr. Olivier took the position that the
8  plaintiff was required to produce reports at least
9  90 days before trial, and that contradictory
10  reports had to be served 30 days after receipt?
11    A.  You have those.  And, therefore, they
12  speak for themselves.
13    Q.  I'm asking for your position?
14    A.  The firm does not have a position on
15  that.
16    Q.  I'm asking for the firm's awareness?
17    A.  He took positions on the application of
18  1425 throughout the handling of that case.  I
19  guess that's what I can say on behalf of the firm.
20      MR. WARREN:
21        Give me #16.
22  EXAMINATION BY MR. WARREN:
23    Q.  After Blue Williams was removed from
24  the case and in interactions with the Duplass
25  firm, do you know whether or not Mr. Olivier took

35 (Pages 137 to 140)

Richard S. Vale
February 26, 2016

Page 141

1  the position that Article 1425(C) applied in this
2  case?
3       A.  No, I don't know, as the firm, whether
4  he did or did not.
5       Q.  Hand you Exhibit #16.
6            It's an e-mail exchange with --
7  between Mr. Olivier and Kevin Derham, and direct
8  you to the top of the first page of #16.
9       A.  Do I need to read the one from Bart
10 Kelly?
11      Q.  You can if you want to.  I don't think
12 it's -- it's necessary.  The reference I'm
13 referring to is -- is where he states that
14 plaintiffs' expert reports were due in accordance
15 with Louisiana CCP, Article 1425(C).
16      A.  Okay.
17      Q.  Do you see that?
18      A.  Yes.
19      Q.  So you would agree with me that even
20 after Blue Williams was dismissed from the case,
21 Mr. Olivier took the position that 1425(C) applied
22 in the Marable case?
23           MR. FRITCHIE:
24                Objection to form.
25           THE WITNESS:

Page 142

1            That's what -- the -- the e-mail
2  speaks for itself, so I -- I can't argue with
3  that.
4  EXAMINATION BY MR. WARREN:
5       Q.  Are you aware of anything that suggests
6  that this is not what Mr. Olivier wrote to
7  Mr. Derham?
8       A.  No.
9       Q.  Has Mr. Olivier told you that --
10 that -- that someone faked this e-mail or made it
11 up?
12      A.  No.  No.
13      Q.  Okay.  In fact, the e-mail was produced
14 by Blue Williams, wasn't it?
15      A.  BW -- it has a Bates number on it, so I
16 would assume so, yes.
17      Q.  So if -- based on this statement dated
18 January 25th, 2014, by Mr. Olivier to Mr. Derham,
19 Blue Williams disagrees with Mr. Olivier rel- --
20 regarding the application of 1425(C)?
21      A.  Yes.
22      Q.  You've said it doesn't apply.
23           But after -- after Mr. Olivier's
24 dismissed and when he is corresponding with
25 Mr. Derham, the successor counsel, he says it did

Page 143

1  apply, correct?
2       A.  That's what he says; and we disagree
3  with that, correct.
4       Q.  If Mr. Olivier's correct in the
5  statement that he makes in Exhibit #16, that
6  1425(C) applies, what was he, on behalf of Empire,
7  required to do within 30 days of receipt of the
8  plaintiffs' reports?
9            MR. FRITCHIE:
10                Object to form.
11           THE WITNESS:
12                That's an opinion.  I'm not here
13 to give opinions in this case.
14 EXAMINATION BY MR. WARREN:
15      Q.  So you've got a position as to whether
16 1425(C) applies or not --
17      A.  That's our position.
18      Q.  -- you said it doesn't?
19      A.  That it does not, correct.
20      Q.  Right.
21           And -- but if it does apply, you
22 don't know what it -- what it would require?
23           MR. FRITCHIE:
24                Let me object to the form.
25           THE WITNESS:

Page 144

1            It doesn't apply.
2  EXAMINATION BY MR. WARREN:
3       Q.  I understand that's your position.
4       A.  Okay.
5       Q.  Yeah.  It's -- I mean, it's not --
6            MR. FRITCHIE:
7                It's argumentative.  Object to the
8  form.
9  EXAMINATION BY MR. WARREN:
10      Q.  It's not really that funny.
11      A.  All right.
12      Q.  But I understand it's your position.
13      A.  Okay.
14      Q.  But what I'm asking you is, is if this
15 statement is correct and it did apply, the
16 statement in Exhibit #16, by your lawyer, who you
17 say -- who you defer to, if this is true, what
18 would that require the defendant to do within 30
19 days of receipt of the plaintiffs' report?
20           MR. FRITCHIE:
21                Objection to form.
22           THE WITNESS:
23                If 1425(C) applied, then when --
24 which it didn't.  We -- I don't have to keep
25 saying that, right?  Then once a expert report, in

36 (Pages 141 to 144)

Richard S. Vale
February 26, 2016

Page 145

1　final form, according to 1425, was received, that
2　if you interpret 1425(C) within 30 days, a
3　rebuttal report shall be required.
4　EXAMINATION BY MR. WARREN:
5　　　**Q. With respect to the April 15, 2013,**
6　**Charlie Miller report, which was in Mr. Olivier's**
7　**possession in October of 2013; and the April 15,**
8　**2013, Charlie Miller report that was provided to**
9　**him by plaintiffs' counsel in December after he**
10　**insisted that he had not received it; with respect**
11　**to the report itself -- and I'm talking about the**
12　**letter, what's written in the letter, signature --**
13　**is there any difference between those two**
14　**documents, the one received and in his possession**
15　**in October and the one that was sent to**
16　**Mr. Olivier in December?**
17　　　MR. FRITCHIE:
18　　　　Objection, form.
19　　　THE WITNESS:
20　　　　The one prior to December did not
21　have the attachments that needed to be attached in
22　order to make it a final report per 1425, if in
23　the event 1425 even applied in the first place.
24　EXAMINATION BY MR. WARREN:
25　　　**Q. Yes. And -- and I -- I'm -- I'm**

Page 146

1　**through asking you about the -- the application.**
2　　　A. All right.
3　　　**Q. What I -- what I'm just trying to**
4　**understand is factually.**
5　　　　**We can agree that the report**
6　**itself --**
7　　　A. The words?
8　　　**Q. On the page, the signature, all -- it's**
9　**all -- it's the same document that he has in -- in**
10　**October of 2013 that plaintiffs' counsel sends to**
11　**him; I think it's December 12th?**
12　　　A. I haven't compared them.
13　　　**Q. So you can't say that there's any**
14　**difference between the two?**
15　　　A. I would defer to Richard or Brian.
16　　　**Q. And the only difference that -- that**
17　**you would want to point out here is, is that it's**
18　**your position that the -- that there was some**
19　**attachments, some photographs, that should have**
20　**been included that were not included in the report**
21　**as produced in Oct- -- October or earlier, but**
22　**were included when it was produced in December?**
23　　　A. Yeah, I -- I -- I think Richard really
24　didn't think, in his mind, that he had a report
25　that co- -- that would trigger his duty to file a

Page 147

1　rebuttal report within 30 days, even if 1425
2　applied.
3　　　**Q. If you receive a report from the other**
4　**side --**
5　　　A. Me?
6　　　**Q. Yeah.**
7　　　A. Just --
8　　　**Q. You.**
9　　　A. Okay.
10　　　**Q. Blue Williams.**
11　　　A. All right.
12　　　**Q. If your attorneys receive a report from**
13　**the other side that's a signed report and has**
14　**opinions in it that's relevant to the case --**
15　　　A. Okay.
16　　　**Q. -- and there's not -- you believe that**
17　**maybe there's some photos that should have been**
18　**included with it, what's the appropriate thing to**
19　**do?**
20　　　MR. FRITCHIE:
21　　　　Object to the form.
22　　　THE WITNESS:
23　　　　I don't think the firm has a
24　procedure or protocol on that. They would defer
25　to the practice groups on how they would handle

Page 148

1　that.
2　EXAMINATION BY MR. WARREN:
3　　　**Q. What would you do?**
4　　　A. Me?
5　　　**Q. Yeah.**
6　　　A. Well, I usually don't run into this
7　problem because ever since 1425 came out, I get
8　the Court to set deadline dates for expert
9　reports.
10　　　**Q. But regardless of that --**
11　　　A. So I --
12　　　**Q. -- let's assume you've got deadlines**
13　**dates, and you -- you're trying to get back**
14　**into --**
15　　　A. Right.
16　　　**Q. -- application of 1425.**
17　　　　**I'm just saying you get a --**
18　　　A. No, I'm not --
19　　　**Q. You get a report.**
20　　　A. Okay.
21　　　**Q. And you believe there's some**
22　**photographs that ought to be included with it.**
23　　　A. (Affirmative response.)
24　　　**Q. What do you do?**
25　　　A. Well, if I'm -- if -- and you're asking

37 (Pages 145 to 148)

Richard S. Vale
February 26, 2016

Page 149

1  me personally at this point, I guess.
2           If I perceive that what the
3  plaintiff is trying to send me is what he thinks
4  is going to be his final report for purposes of
5  the case, then I would probably write him a letter
6  and/or call him and say, "You still haven't given
7  me the photographs or the measurements that I
8  need." But if it was just him sending me a
9  preliminary report that I don't perceive to be
10 what he's trying to indicate as his final report,
11 I would just look at it and read it and probably
12 send it on to my experts.
13      Q.  And can -- have you reviewed the -- the
14 April 15th, 2013, report that was in Mr. Olivier's
15 possession in October?
16      A.  No.
17      Q.  Does it have the word "preliminary"
18 anywhere in it?
19      A.  I haven't read it.
20      Q.  Okay.  So -- so on behalf --
21      A.  I don't know.
22      Q.  -- of Blue Williams --
23      A.  Don't know.
24      Q.  -- you can't speak to this at all?
25      A.  I don't know.

Page 150

1       Q.  Was it available to you if you wanted
2  to look at it before you came to give this
3  deposition?
4       A.  Sure.
5       Q.  Did you know I was gonna ask you about
6  it?
7       A.  And I was gonna say defer to
8  Mr. Olivier and Mr. Bossier.  They know what was
9  going on in the case.  To try to create a -- the
10 knowledge of the firm outside of what Mr. Olivier
11 and Mr. Bossier know is, in some instances,
12 impossible to do.
13      Q.  Do you have Exhibit #4 in front of you
14 there?  Here you go.
15          Did you review that in preparation
16 for your deposition today?
17      A.  No, sir.
18      Q.  Were you aware of this document before
19 today?
20      A.  It's in the f- -- it's in the file.  So
21 to that extent, it -- it's -- I assume it was in
22 the file.
23      Q.  Yeah, but I'm not asking you about
24 constructive knowledge at this point.
25      A.  Okay.

Page 151

1       Q.  I -- I -- what I'm asking you is if
2  you, as the representative of Blue Williams, who
3  has come here to testify on Blue Williams behalf
4  about this Charlie Miller report, and who sat in
5  on either all or most of the depositions in the
6  case, were you aware of the existence of Exhibit
7  #4 and what it said prior to my showing it to you
8  today?
9       A.  Outside of what Mr. Olivier or
10 Mr. Bossier might know, no, I can't re- -- I can't
11 even recall seeing this.
12      Q.  Would you agree with me, on behalf of
13 Blue Williams, that Exhibit #4 indicates that at
14 some point prior to 10:46 p.m. on October 22nd,
15 2013, Mr. Olivier had reviewed Marable's answers
16 to Empire's discovery request and was aware that
17 included in those responses was a report from
18 plaintiffs' expert?
19      MR. FRITCHIE:
20          Objection to form.
21      THE WITNESS:
22          No, I can't tell you that.
23 EXAMINATION BY MR. WARREN:
24      Q.  But that's what it says, isn't it?
25      A.  No, I don't -- I don't know if that's

Page 152

1  what it says.
2       Q.  It says -- then I'll read it to you.
3  "Jessica, I can't find Wayne Marable's answers to
4  Empire's discovery request in Interwoven," period.
5  I see it in the discovery folder," period.  There
6  is a report from his expert that I need to get out
7  to all of our folks."
8       A.  Okay.  And your question is?  Does this
9  indicate --
10      Q.  First of all, let me -- let me -- let
11 me take this one step at a time.
12          Did I read that correctly?
13      A.  Except for, "Thanks, Richard," yes.
14      Q.  Okay.  Now, it is clear, from this
15 e-mail between Mr. Olivier and his assistant, that
16 prior to his writing this e-mail, he was aware
17 that a report from the plaintiffs' expert was in
18 Marable's answers to Empire?
19      MR. FRITCHIE:
20          Object to the form.  You mis- --
21      THE WITNESS:
22          I --
23      MR. FRITCHIE:
24          Objection to form.
25      THE WITNESS:

38 (Pages 149 to 152)

Richard S. Vale
February 26, 2016

Page 153

1      I don't know what that says.  Ask
2  Richard.
3  EXAMINATION BY MR. WARREN:
4      Q.  Well, we're gonna get -- we're gonna
5  get to it in just a minute, and it -- he'll come
6  out and say it to his codefense counsel, so you --
7  his codefendant's counsel, so you can -- we can do
8  this the hard way or the easy way.
9          But you -- it's -- it's your
10 position, on behalf of Blue Williams, that this
11 e-mail doesn't mean that prior to writing the
12 e-mail, at some point prior to it, he had seen the
13 expert report and knew that it was with the
14 discovery responses?
15     A.  I don't know.
16     Q.  Is there any part of the English that
17 is written on that sheet of paper that makes you
18 think what I said is untrue?
19     MR. FRITCHIE:
20         Objection to the form.
21         Don't answer that.  It's
22 argumentative.
23 EXAMINATION BY MR. WARREN:
24     Q.  Is there?
25     MR. FRITCHIE:

Page 154

1          Don't answer it.  It's
2  argumentative.  No reason to answer that.
3      MR. WARREN:
4          I don't think that's the basis for
5  a --
6      MR. FRITCHIE:
7          You're arguing with him about what
8  the English language says.  That's not a question.
9          Don't answer it.
10     MR. WARREN:
11         No, it is a question.
12     MR. FRITCHIE:
13         It is not.
14     MR. WARREN:
15         It --
16 EXAMINATION BY MR. WARREN:
17     Q.  What portion of this e-mail suggests to
18 you that he was not previously aware of the
19 existence of the report with the discovery
20 responses?
21     A.  I don't -- he's obviously aware of the
22 expert report before 10:46 p.m. on October the
23 22nd.  Whether it was part of the discovery
24 responses is the ambiguous part of the -- this
25 e-mail; and, therefore, you need to talk to

Page 155

1  Richard about it.
2      MR. WARREN:
3          Will you get me #6.
4      MS. THIGPEN:
5          Okay.
6  EXAMINATION BY MR. WARREN:
7      Q.  I hand you Exhibit #6.
8          Now, the e-mail we just looked at
9  is dated October 22nd.  On the 23rd, here's an
10 e-mail, on behalf of Mr. Olivier by Jessica
11 Militello, transmitting -- and I'm quoting Richard
12 Olivier here, ". . . plaintiff Marable's expert
13 reports for your review."
14         Did I read that correctly?
15     A.  Yes.
16     Q.  Okay.  And one of the documents
17 attached is the Charlie Miller April 15, 2013,
18 document; is it not?
19     A.  Um . . .
20     Q.  It's right there listed on the
21 attachments on the front.
22     A.  Well, I don't know if these came
23 together.  I mean --
24     Q.  What does it --
25     A.  -- can I assume that?  The -- 'cause

Page 156

1  the Bates numbers are off.
2      Q.  What does it say at the top?
3      A.  What does it say at the top.
4          Marable's -- Charlie Miller --
5  okay.  So it was attached.  All right.  Fair
6  enough.  I just didn't . . .
7      Q.  Yeah.
8      A.  Again, I didn't send this out, so I
9  don't know --
10     Q.  So --
11     A.  -- exactly how -- what happened.
12     Q.  So what that indicates to you, as the
13 representative of Blue Williams, is, is that on
14 the 23rd, by the 23rd, the next day after the
15 exchange between Mr. Olivier and his assistant,
16 they're transmitting these reports, including the
17 April 15th, 2013, report of Charlie Miller, to --
18 I believe it's a couple of their e- -- their own
19 experts, correct?
20     A.  Correct.
21     MR. WARREN:
22         #14.
23 EXAMINATION BY MR. WARREN:
24     Q.  Hand you Exhibit #14.
25         If we look at the second page of

Richard S. Vale
February 26, 2016

Page 157

1   Exhibit #14, Mr. Olivier is responding to an
2   e-mail from Woody Norwood.  Mr. Norwood is asking
3   a question about the Miller reports.
4           And I'll show you -- show on the
5   second page, there is a paragraph.  It's the -- it
6   looks like the second paragraph.  I think it's
7   actually the third paragraph of Mr. Olivier's
8   e-mail, where he says, "The other two Miller
9   reports, 9-22-12 and 4-15-13, appear to have been
10  attached to Bart Kelly's answers to
11  interrogatories and RFPs propounded by me, Empire
12  and Hudspeth."
13          Do you see that?
14      A.  Yes, sir.
15      Q.  And so this is a statement by your
16  attorney, Mr. Olivier, indicating that the 4-15-13
17  report was attached to the discovery responses --
18          MR. FRITCHIE:
19              Objection to the form.
20  EXAMINATION BY MR. WARREN:
21      Q.  -- provided by the plaintiff?
22          MR. FRITCHIE:
23              Objection to the form.  You're
24  misstating what he said.
25              You can answer.

Page 158

1           THE WITNESS:
2               I --
3           MR. FRITCHIE:
4               Object- -- I just objected to the
5   form.
6           THE WITNESS:
7               I mean, I -- I'm sorry.  I don't
8   know what you're asking me, to be honest with you.
9   EXAMINATION BY MR. WARREN:
10      Q.  Well, you -- you hung up with me.
11      A.  And --
12      Q.  If you go back -- if you go back to
13  Exhibit #4 and look at Exhibit #4, I was trying to
14  get you, on behalf of Blue -- Blue Williams, to
15  agree with me that on October the 22nd, 2013, that
16  Mr. Olivier was saying that he had seen the report
17  and that it was with the discovery responses.
18      A.  Right.
19      Q.  Do you remember that?
20      A.  Yes, sir.
21      Q.  Okay.  Now I'm showing you an e-mail
22  from your attorney, Mr. Olivier, which is Exhibit
23  #14, where he's explaining the origin of the
24  reports to codefendants' counsel.
25      A.  Okay.

Page 159

1       Q.  And he says, "The other two Miller
2   reports, 9-22-12 and 4-15-13, appear to have been
3   attached to Bart Kelly's answers to
4   interrogatories and RFPs propounded by me, Empire
5   and Hudspeth."
6       A.  Okay.
7       Q.  So if you had any doubt about it
8   looking at Exhibit #4, looking at Exhibit #14,
9   here on behalf of Blue Williams, you'll agree with
10  me that Mr. Olivier was of the view that these --
11  that the 4-15-13 Charlie Miller report was
12  included with Bart Kelly's answers to
13  interrogatories and RFPs?
14          MR. FRITCHIE:
15              Objection to --
16          THE WITNESS:
17              Yes.
18          MR. FRITCHIE:
19              -- form.
20  EXAMINATION BY MR. WARREN:
21      Q.  Thank you.
22          MR. WARREN:
23              Hey, guys, we've been going an
24  hour and 15 minutes.  Why don't we take a break,
25  and that'll give you a chance to talk.

Page 160

1           THE VIDEOGRAPHER:
2               We're off the record.  The time is
3   2:15 p.m.
4               (Whereupon a recess was taken.)
5           THE VIDEOGRAPHER:
6               We're back on the record.  The
7   time is approximately 2:29 p.m.
8   EXAMINATION BY MR. WARREN:
9       Q.  Looking at Exhibit #6, which that's the
10  one that has the reports attached to it.
11      A.  Okay.
12      Q.  Then if you'll look at the April 15th
13  report of Charlie Miller --
14      A.  Okay.
15      Q.  -- there.
16          You had said earlier in -- in the
17  answer to one of my questions, you had referred
18  to, you know, "If I had this report, and it was a
19  preliminary report, I might not do anything"?
20      A.  Right.
21      Q.  On behalf of Blue Williams sitting here
22  today and looking at the Charlie Miller report
23  dated April 15th, 2013, that's signed by him, is
24  there anything about that report that would
25  indicate to you that it was preliminary?

40 (Pages 157 to 160)

Richard S. Vale
February 26, 2016

Page 161

 1    A.  I wouldn't know.
 2    Q.  Okay.  So you don't have an answer for
 3  me, on behalf of Blue Williams, as to whether or
 4  not there's anything about the April 15th, 2013,
 5  Charlie Miller report, which is a part of Exhibit
 6  #6, that would make it a preliminary report?
 7    A.  That's correct.
 8    Q.  Is there even anything about the report
 9  that -- that indicates that it's incomplete?
10    A.  Same answer:  I'd have to defer to
11  Mr. Olivier and Mr. Bossier on that since I wasn't
12  the handling attorney on this file.
13    Q.  Looking at the April 15th, 2013,
14  report, if -- if you believe that 1425(C)
15  applied --
16    A.  Okay.
17    Q.  -- and you -- and -- and one of your
18  attorneys, one of your Blue Williams attorneys,
19  has this report in front of him or her, and it's
20  been served on him or her, is there anything about
21  the report, as it is presented here, that would
22  indicate that it would not trigger a requirement
23  for rebuttal or contradictory report within 30
24  days?
25    A.  I would have --

Page 162

 1    MR. FRITCHIE:
 2        Object to the form.
 3    THE WITNESS:
 4        I would have to defer to Richard
 5  and Ri- -- and -- and Brian on that.  I wouldn't
 6  know the context.  The firm does not know the
 7  context in which this report would have been sent
 8  or what it ref- -- what it referred to.  There may
 9  be a whole lot of other issues that would clearly
10  show that this is not a final report.  Again, it
11  doesn't have the attachments that are necessary
12  for 1425 to be considered a final report, so I
13  would defer to the handling attorneys.
14  EXAMINATION BY MR. WARREN:
15    Q.  Are -- are you saying that 1425
16  requires that all expert reports have attachments?
17    A.  Yes.  To be final.
18    Q.  And is -- is it Blue Williams' position
19  that any report served pursuant to 1425 that does
20  not have attachments does not trigger a
21  requirement to file a rebuttal or contradictory
22  report within 30 days?
23    A.  I don't think the firm has an opinion
24  one way or another on that.
25    Q.  Okay.  Show you what's been marked as

Page 163

 1  Exhibit #143.  It's the motion to continue.
 2        You've seen this document prior to
 3  your testimony here today?
 4    A.  Yes.
 5    Q.  And when was that?
 6    A.  I guess in getting ready for the -- for
 7  this deposition, since it was something that was
 8  specifically identified in the 30(b)(6), Item 12.
 9    Q.  If you look at Page 5 of the motion or
10  the -- I guess it's the --
11    A.  The memorandum?
12    Q.  The memorandum.  It's B- -- BW 0085343.
13    A.  Okay.  I have it in front of me.
14    Q.  You do have it in front of you?
15    A.  Yes, sir.
16    Q.  Near the middle of that first paragraph
17  under Roman numeral II, it says, "Motion" --
18  "Mis- -- "Mr. Marable has failed to produce basic
19  documents requested on August 19" --
20    A.  Slow -- slow -- slow down, please.  Let
21  me find it.
22        "Further frustrating defendants'
23  attempts --
24    Q.  Yes.
25    A.  -- to move this case forward"?  All

Page 164

 1  right.
 2    Q.  Mr. --
 3    A.  Go ahead.  I 'm sorry.
 4    Q.  "Mr. Marable has failed to produce
 5  basic documents requested on August 19th, 2013;
 6  most importantly, any expert reports prepared by
 7  their designated experts" -- and there are several
 8  listed -- "including Charlie Miller."
 9    A.  Okay.
10    Q.  Now, on behalf of Blue Williams, is it
11  your position that that is a true statement as of
12  December 2013 --
13    A.  Yes.
14    Q.  -- in view of these documents you've
15  just reviewed?
16    A.  Yes.
17    Q.  Can you explain your basis for saying
18  that?
19    A.  Well, again, I would defer to
20  Mr. Olivier.  But what he's -- I don't think there
21  was any issue that Savant and Gorman's reports had
22  not been produced by this date in any shape or
23  form.  And, again, Charlie Miller had not, at the
24  time of this filing, which was before the December
25  e-mail that's somewhere in here -- that he had

Richard S. Vale
February 26, 2016

Page 165

1    gotten a final report from Charlie Miller.
2          And knowing Richard for the last
3    15 or so years, it -- it would surprise me that he
4    would, in any case, intentionally misrepresent
5    facts to a court.  That's just not him.  So . . .
6        Q.  Well, regardless of what you think
7    about him on a personal level, I mean, the --
8    the -- the document says what it says --
9        A.  Yes.
10       Q.  -- does it not?
11       A.  Yes, it does.
12       Q.  And it says that no expert report
13   prepared by Charlie Miller had been produced by
14   plaintiffs?
15       A.  Right.
16       Q.  And you've looked at these other
17   documents that show that a document, that is an
18   expert report from Charlie Miller, was received
19   and was distributed, not only to experts, but to
20   codefendants' counsel in October?
21       A.  I don't think -- Richard didn't think
22   it was a final report or a report until he got the
23   attachments and all that.  I really think that was
24   what was in his mind at that point in time when he
25   wrote this.

Page 166

1        Q.  Would you have --
2        A.  But you've already shown me reports
3    that Richard had in his file and sent around prior
4    to the filing of this motion to continue.  I
5    don't -- I'm not disagreeing with that point.
6        Q.  Okay.  And -- and so it's only your
7    belief that Richard wouldn't intentionally mislead
8    that keeps you from recognizing that this
9    statement in the motion to dismiss is inconsistent
10   with the facts?
11       MR. FRITCHIE:
12           Objection.
13       THE WITNESS:
14           And --
15       MR. FRITCHIE:
16           Objection.
17           Subject to that, you can answer.
18       THE WITNESS:
19           And that it -- it really s- --
20   after discussing with him, in his mind, it wasn't
21   an expert report unless you get everything.  And
22   he hadn't gotten everything by that point in time,
23   so it wasn't an expert report.  That was just the
24   way he thought of it.
25   EXAMINATION BY MR. WARREN:

Page 167

1        Q.  Okay.  Well, while we're looking at
2    this motion, okay --
3        A.  Okay.
4        Q.  -- you would agree with me that -- that
5    Richard, the guy who you say can't tell a lie --
6        A.  I didn't say that.
7        Q.  Well, but you -- you -- you -- you said
8    he would --
9        A.  He would not intentionally misrepresent
10   anything to a court of law.
11       Q.  Okay.  That same Richard --
12       A.  Okay.
13       Q.  -- said to the Court that Civil Code of
14   Procedure 1425(C) requires a production no later
15   than 90 days prior to trial?
16       A.  Right.
17       Q.  Right?
18       A.  Right.
19       Q.  So in December of 2013 when he filed
20   this motion or was involved in its filing, that's
21   what he believed?
22       A.  Apparently.
23       Q.  Because he would not misrepresent to
24   the Court, would he?
25       A.  Yes.  That's correct.

Page 168

1        Q.  And to -- to be sure that I understand
2    your position, it's essentially that there were
3    some photographs that were supposed to be attached
4    to this report, he believes now?
5        A.  I think there were some measurements
6    too; and, in his mind, it was not a final report
7    since it didn't have everything.
8        Q.  Have you -- can you describe what
9    you're talking about by "measurements"?
10       A.  No, sir.
11       Q.  I'm gonna hand you Exhibit #3.
12       MR. BOSSIER:
13           Thank you.
14       THE WITNESS:
15           It's backwards.
16   EXAMINATION BY MR. WARREN:
17       Q.  Now, this is -- this is an exchange
18   between Mr. Olivier and plaintiffs' counsel,
19   copying others --
20       A.  Okay.
21       Q.  -- after the 4-15 Charlie Miller
22   report.
23           And if you look at the second page
24   of Exhibit #3, you'll see the first line of Bart
25   Kelly's e-mail:  "Here again is Mr. Miller's

42 (Pages 165 to 168)

Richard S. Vale
February 26, 2016

Page 169

1  signed report."
2       A.  Okay.  That's what it says.
3       Q.  Okay.  And then in response to that,
4  Mr. Olivier says, "We are in receipt of and thank
5  you for the attached copy of Charlie Miller's
6  report, which, for the record, we never received
7  from you in this matter."
8       A.  Okay.
9       Q.  And that's -- if -- if you look at the
10 top, there is -- the report is dated April 15th,
11 2013.
12          Do you see the reference at the
13 top?
14      A.  Yeah.  Okay.
15      Q.  Now, you told me earlier that you
16 believe that -- on behalf of Blue Williams, that
17 Mr. Olivier was under an obligation to be candid
18 and honest with opposing counsel?
19      A.  Correct.
20      Q.  This is not an honest statement, is it?
21      MR. FRITCHIE:
22          Objection to the form.
23      THE WITNESS:
24          I -- an honest statement mean- --
25 implies that he was lo- -- intentionally --

Page 170

1  misrepresenting the facts.  I don't think Richard
2  was ever intentionally misrepresenting the facts
3  to anyone in this case.
4  EXAMINATION BY MR. WARREN:
5       Q.  Let me -- let me ask you this on behalf
6  of Blue Williams.
7          Has Blue Williams considered the
8  fact that its attorney, employed attorney, Richard
9  Olivier, realized that he was in trouble over the
10 prior receipt of the Charlie Miller report and
11 attempted to create a new deadline by soliciting a
12 resubmittal of the report by plaintiffs' counsel?
13      A.  No.
14      Q.  You acknowledge, do you not, that after
15 receipt of this report on December 12th, that your
16 employee, Mr. Olivier, set a new de- -- set a
17 deadline for production of defendants'
18 contradictory reports 30 days later?
19      A.  Okay.  Yes.
20      Q.  You agree with that?
21      A.  Yes.
22      Q.  Okay.  And the only reason why that
23 deadline would be necessary is if he believed
24 1425(C) applied?
25      A.  Yes.

Page 171

1       Q.  Had you reviewed Exhibit #3 before
2  today's deposition?
3       A.  Probably not.
4          I remember seeing something about
5  the photographs.
6       Q.  Yeah.
7       A.  But I don't recall -- I didn't read a
8  whole lot of this file.
9       MR. FRITCHIE:
10          You're referring to the underlying
11 file?
12      THE WITNESS:
13          Well, yeah, the Marable.
14          Thank you.
15      MR. WARREN:
16          #17.
17 EXAMINATION BY MR. WARREN:
18      Q.  Hand you Exhibit #17.
19          This is a follow-up to the same
20 exchange with plaintiffs' counsel.  December 12th,
21 Mr. Olivier's writing to several people, including
22 Peter Bloom at Travelers?
23      A.  Okay.
24      Q.  Are you familiar with this document?
25      A.  I believe so, yes.

Page 172

1       Q.  Had you reviewed it before coming here
2  today?
3       A.  I'm pretty sure I did.
4          Is it -- can I ask, is this one of
5  the ones that's specifically identified in the
6  30(b)(6) notice as being something to discuss?
7  Because it has a different Bates number.
8          I know I looked at the ones --
9  excuse me -- that are referenced in -- in the
10 30(b)(6) notice.  You know, for instance, in
11 No. 7, you have an actual Bates number.
12 EXAMINATION BY MR. WARREN:
13      Q.  Right.
14      A.  So I looked at those.  I -- I -- this
15 one looks familiar.  At the same time, I'm not
16 sure if it's one that I looked at in preparation
17 for the 30(b)(6).
18      Q.  In -- in this -- this e-mail that is
19 Exhibit #17 to various individuals, including
20 Mr. Bloom, Mr. Olivier states, "Attached is an
21 e-mail that is self-explanatory referencing the
22 plaintiff's export report that they" -- open
23 quote -- "reportedly," close quote, provided some
24 time ago."  And then he says, "Needless to say,
25 they have no proof of delivery, and the issue of

Richard S. Vale
February 26, 2016

Page 173

1  late production of reports and the consequences
2  will be fought at a later date."
3      A.  Okay.
4      Q.  Now, in that paragraph, or anywhere
5  else in -- in this e-mail, does it say that
6  that -- the prior report was incomplete?
7      A.  No.  Also, this brings to mind the fact
8  that Richard was unsure how he ever got the Miller
9  report in the first place, and it may have been
10  from the Jones parties rather than the plaintiff.
11  So that's -- gets even more jumbled after a while.
12      Q.  I -- I'm not sure I -- I --
13      MR. WARREN:
14          I'll object and move to strike
15  the -- the nonresponsive answer if you --
16      THE WITNESS:
17          Well, he says, "referencing the
18  plaintiff's expert reports that they 'reportedly'
19  provided some time ago."  You're gonna have to ask
20  Richard, but I think he's referring to the -- to
21  Marable.  And I think there's -- Richard has had
22  some question in his mind as to when he got that
23  iteration of the Charlie Miller report prior to
24  December.  And it -- and so that may be part of
25  the "reportedly" part of this e-mail.

Page 174

1  EXAMINATION BY MR. WARREN:
2      Q.  He explains that in some of the other
3  documents --
4      A.  Okay.
5      Q.  -- that you've looked at, and -- and
6  the earlier version was produced separately, but
7  not the 4-15.
8      A.  Okay.
9      Q.  But if you look at the second page of
10  Exhibit #17, sir, this is the e-mail from Bart
11  Kelly that's transmitting -- he says "again" --
12  the Miller report.
13      A.  I got it.
14      Q.  Okay.
15      A.  And you got the signed thing
16  underlined?
17      Q.  Right.  I don't -- I don't -- I'm not
18  sure why that's underlined, but . . .
19          The -- turning back to the first
20  page of #17, Mr. Olivier now is writing just
21  to defense counsel or just to experts or just to
22  other people in his office; he's writing to the
23  client?
24      A.  Correct.
25      Q.  And he's saying -- making a statement

Page 175

1  that the report was, open quote, reportedly,
2  provided some time ago.
3      A.  Okay.
4      Q.  And then makes the statement that they
5  have no proof of delivery and the issue of late
6  productions and consequences to be fought at a
7  later date.
8      A.  Okay.
9      Q.  Now, would -- would you agree with me
10  that since he had the report at least in October,
11  that this statement to his client lacks sufficient
12  candor?
13      A.  No.
14      MR. FRITCHIE:
15          Objection to the form.
16      THE WITNESS:
17          No.
18  EXAMINATION BY MR. WARREN:
19      Q.  There is this reference to the issue of
20  late production of reports, and consequences will
21  be fought at a later date?
22      A.  Okay.
23      Q.  On behalf of Blue Williams, can you
24  tell us whose reports he's talking about are late,
25  and what consequences he's talking about?

Page 176

1      A.  No, sir.
2      Q.  To be clear, in this correspondence to
3  Travelers, he -- Mr. Olivier makes clear that he
4  believes 1425 applies?
5      A.  Procedurally, our expert rebuttal
6  reports are due 30 days from the receipt of the
7  opposing parties' reports.  So apparently he's
8  under the impression he has to get his rebuttal
9  reports out within 30 days of receiving --
10      Q.  Right.
11      A.  -- plaintiffs' expert reports.
12      Q.  When did Blue Williams first give
13  Travelers an estimate regarding the settlement
14  value of the Marable action?
15      A.  I -- the firm wouldn't know that.
16  You'd have to ask Mr. Bossier or Mr. Olivier.
17      Q.  Did the Blue Williams attorneys
18  involved in the defense of the Marable action
19  reach a conclusion regarding the settlement value
20  of -- of that Marable suit at some point prior to
21  sharing that information with Travelers?
22      A.  The firm would not know that.  You
23  would have to ask Mr. Bossier or Mr. Olivier.
24      Q.  With respect to the estimates of
25  settlement value, have you taken any steps to

Richard S. Vale
February 26, 2016

Page 177

1    review documents or interview any witnesses
2    relative to the manner in which or the timing in
3    which Blue -- the Blue Williams attorneys involved
4    in the Marable defense reached conclusions
5    regarding the settlement value of that case?
6         A.  No.
7         Q.  Have you reviewed any of the draft
8    pretrial reports?
9         A.  Draft?  I don't think I've reviewed any
10   draft pretrial reports.
11        Q.  Did you review the pretrial report that
12   was actually transmitted to -- or I think it's
13   called a "trial report"; I'm calling it pretrial.
14             But trial report that was
15   transmitted --
16        A.  -- in January?
17        Q.  Yes, in January.
18        A.  Yes.
19        Q.  You reviewed that?
20        A.  Yes.  In the context of this
21   litigation.  Not --
22        Q.  Right.
23        A.  Not for any other purpose.
24        Q.  Does Blue Williams agree with the
25   conclusions in that report?

Page 178

1         A.  Well, Blue Williams has no opinions,
2    one way or the other, as to whether that's an
3    accurate valuation of the case.  You would have to
4    defer to Mr. Olivier and Mr. Bossier.
5         Q.  What obligations doe- -- do Blue
6    Williams attorneys have to communicate with their
7    clients relative to the exposures associated with
8    a particular case they're defending?
9         A.  I think I already answered that.
10   Attorneys owe a duty to inform the client of
11   ongoing facts and issues on a timely basis in
12   order that the client can make whatever decisions
13   it needs to make in connection with their handling
14   of the file.
15        Q.  If the first time -- if this case was
16   set for trial in early February, and the first
17   time Mr. Bossier and Mr. Olivier reported to
18   Travelers relative to their estimate of the value
19   of the case or the settlement value of the case
20   was January 14th, 2014, would that be sufficient
21   communications in your view?
22        MR. FRITCHIE:
23             Objection to the form.  Calls
24   for -- calls for facts not in evidence.
25             Subject to it.

Page 179

1         THE WITNESS:
2             I think they're reporting the
3    whole time to Peter Bloom.  I think, finally,
4    Peter Bloom asked Blue Williams to fill out that
5    report; so they did it in a timely fashion after
6    being asked to do so.  So I think Blue Williams
7    satisfied its duty to the client to provide them
8    with information on a timely basis.  It was up to
9    Peter Bloom to do with it what he so elected to
10   do.
11   EXAMINATION BY MR. WARREN:
12        Q.  Yeah.  And a moment ago, I said January
13   14th.  I meant 13th.  I apologize.  I'm off a day.
14        A.  Okay.
15        Q.  You know, I'm -- I'm --
16        A.  Fair enough.
17        Q.  It doesn't matter --
18        A.  I thought it was January the 7th, so I
19   was . . .
20        Q.  Yeah.
21             I- -- in -- in the -- in the
22   report -- and I'll be happy to share it with you,
23   but I -- I think you can take my representation on
24   this; that -- that there's a recommendation
25   attempting to settle the matter in the range of 6

Page 180

1    to $7 million, and even that recommendation says
2    it does not contemplate plaintiff's amended life
3    care plan that had just been received.  This was
4    based on a 50 percent chance of plaintiff's
5    recovery.
6             When was that valuation
7    communicated to Peter Bloom prior to January 13th,
8    2014?
9         A.  What information?
10        Q.  That valuation.
11        A.  The -- the -- the -- the numerical
12   evaluation?
13        Q.  Right.
14        A.  I don't know.  You'd have to ask
15   Mr. Olivier and Mr. Bossier that.
16        Q.  When did Mr. Olivier or Mr. Bossier
17   reach that evaluation?
18        A.  What evaluation?  I'm -- I'm not trying
19   to --
20        Q.  The one that's --
21        A.  -- play games.  Just . . .
22        Q.  I understand.  It's a poor question.
23   It's getting on into the afternoon now.
24        A.  Fair enough.
25        Q.  I may be getting a little lazy, so let

45 (Pages 177 to 180)

Richard S. Vale
February 26, 2016

Page 181

1  me get -- let me do better.
2          When did Mr. Bossier and
3  Mr. Olivier reach the valuation, the numerical
4  valuation, that is included in Exhibit #22, the --
5  the -- the trial report?
6      A.  This firm would not know that.  You'd
7  have to ask Mr. Bossier or Mr. Olivier.
8      Q.  When did M- -- either Mr. Bossier or
9  Mr. Olivier, or both of them, if -- if it was
10 both, ever communicate to Mr. Bloom at Travelers
11 that there was a 50 percent chance of success in
12 the case prior to January 13th?
13     A.  The firm wouldn't know that.  You'd
14 have to ask Mr. Bossier or Mr. Olivier.
15     Q.  Does Blue Williams have a view as to
16 whether a 50/50 analysis is appropriate in a case
17 of this type?
18     A.  Blue Williams doesn't practice law, so
19 Blue Williams doesn't have an opinion as to
20 whether a 50/50 evaluation would be appropriate or
21 would not be appropriate.
22     Q.  What does Blue Williams do?
23     A.  It's a partnership of professional
24 attorneys practicing law.
25     Q.  Right.

Page 182

1          Is Blue Williams aware of anything
2  that Peter Bloom or Tra- -- or The Travelers
3  Companies involved did or failed to do prior to
4  the decision to terminate Blue Williams from the
5  case?
6          Let -- let me back up and strike
7  that.  I'll start again.
8          Prior to the -- to notification of
9  the termin- -- that Blue Williams was terminated
10 from this case, does Blue Williams take the
11 position that Peter Bloom or The Travelers
12 Companies involved did or failed to do anything in
13 connection with this case that impacted the value
14 of the case or affected Blue Williams' ability to
15 defend it?
16     A.  Yes.
17     Q.  What?
18     A.  I would defer to counsel, and I would
19 defer to Mr. Bossier and Mr. Olivier.  But to the
20 extent the firm is aware, it appears that
21 Mr. Bloom did not properly adjust his file.  I
22 think at one time, he had an 80 percent
23 comparative fault assessment against Mrs. Marable,
24 who was horribly injured in this accident.  And
25 you know the injuries, so I don't have to go into

Page 183

1  it where the leg was pulled from the socket and
2  the degloving of the arm and the fractured ribs
3  penetrating the lungs to where she was -- bled
4  enough that she had anoxia to the brain, which is
5  her permanent condition.
6          And he never, apparently, asked
7  Mr. Olivier or Mr. Bossier, prior to January, for
8  exactly those kind of hard-boiled numerical
9  evaluations on quantum and liability.  And when he
10 finally got that, he panicked and fired us; when
11 the expert issue that we've been talking about all
12 day hadn't even been -- hadn't even arisen yet and
13 was provoked by subsequent counsel, successor
14 counsel, on this case.
15         So I don't know where
16 Mr. Pleter -- Peter Bloom was in connection with
17 this case, but he certainly wasn't adjusting it
18 the way I would have expected a senior adjuster to
19 be adjusting this case and having woefully
20 inadequate reserves.  I think a -- he even asked
21 the attorneys to fill out his report that he had
22 to send to Travelers.
23         And then, finally, he gets the bad
24 news and fires us so that we cannot even control
25 the destiny of the case, and retains new counsel

Page 184

1  three weeks before the trial, which the judge had
2  already said was definitely going.  And then gets
3  bad information from them on 1425 and proceeds to
4  settle the case.  And now arguing that he did that
5  because he thought the defense expert reports were
6  gonna be stricken, which we disagree with.
7      Q.  I don't want to interrupt you.
8          Are you through now?
9      A.  I'm pretty through.
10     Q.  Okay.
11         MR. WARREN:
12             Object and move to strike the
13 nonresponsive response.
14 EXAMINATION BY MR. WARREN:
15     Q.  So prior to the termination of Blue
16 Williams from the defense of this case, it's your
17 position, it's Blue Williams' position, that
18 Mr. Bloom failed to properly adjust the matter?
19     A.  Yes.  "Adjust" meaning evaluating and
20 putting up the correct reserves.
21     Q.  Right.
22     A.  And asking whatever he needed to from
23 counsel to do his job.
24     Q.  Are you aware of whether lead counsel
25 defending this matter ever communicated to

46 (Pages 181 to 184)

Richard S. Vale
February 26, 2016

Page 185

1  Mr. Bloom any concerns relative to the defense of
2  the case?
3      A.  I don't know.
4      Q.  Do you know whether lead counsel, up
5  until four hours -- well, we'll just call it five
6  hours, prior to the finalization of the trial
7  report, whether lead counsel ever had any view as
8  to settlement value of the case?
9      A.  I wouldn't know that.  You'd have to
10  ask Richard.
11      Q.  Okay.  Can you -- can Blue Williams
12  point me to -- or us to any communication, either,
13  you know, on the telephone or otherwise, in a
14  meeting or in writing or e-mail or anything, where
15  Mr. Bloom was provided with information regarding
16  the defense of the Marable case that he did not
17  take into account in his evaluation?
18      A.  The firm wouldn't be able to do that.
19      Q.  Okay.  Has -- has Mr. Olivier or
20  Mr. Bossier told you of -- of such information?
21      A.  That wasn't provided to Mr. Bloom?
22      Q.  Well, when you gave your speech a
23  minute ago, you --
24      A.  Now, that was my po- -- firm's
25  position.

Page 186

1      Q.  We- -- well, I understand.  And I'm
2  glad you finally got one on something.
3           But --
4      A.  You're welcome.
5      Q.  -- it -- it -- i- -- in that firm
6  position statement that you just gave me --
7      A.  (Affirmative response.)
8      Q.  -- you essentially were critical of
9  Mr. Bloom's analysis of the exposure in this case.
10      A.  Okay.
11      Q.  Right.
12           And what I'm -- what I'm -- need
13  to understand from you is what Mr. Olivier or
14  Mr. Bossier told you that they had told Mr. Bloom
15  that they think he ignored.
16           What bad news did they give him?
17      A.  Oh, I -- oh, I see.
18           No, I don't think -- no, I -- I
19  know of no bad news that they gave him that --
20  that he ignores from the -- from the firm's
21  perspective.
22           Now, they may know something that
23  they told him on a phone conference, or even in
24  e-mails, that he may not taken into account.  But,
25  you know, the -- the s- -- -- the s- -- the

Page 187

1  significant injuries in this case -- and this was
2  in his deposition -- and he asse- -- assessed an
3  80 percent comparative fault against the injured
4  victim for running after the truck.
5           And then with all the injuries,
6  and -- and he knew, apparently, from his
7  deposition, the medical expenses per day for her
8  care.  And to have a $1 million reserve just
9  sounded woefully inadequate.  And then he started
10  to play with the reserves at the end when he
11  started talking to his supervisors, which
12  indicated to the firm that he doesn't take
13  reserves very seriously apparently.
14      Q.  What do you mean when you say "he
15  started to play with the reserves"?
16      A.  Well, he was -- they would know more
17  about this.  When I say "they," Mr. Bossier and
18  Mr. Olivier.  But apparently he had a $1 million
19  reserve, and then after talking to some
20  supervisors, he adjusted the comparative fault and
21  some other thing so that he could get to a $3
22  million reserve.  So . . .
23      Q.  So he raised his reserve?
24      A.  After playing with the comparative
25  fault to sort of get a better explanation on paper

Page 188

1  as to why he was doing that, yes.
2      Q.  Okay.  And you're critical of that
3  because why?
4      A.  Because of the significance of the
5  claim and the potential liability.
6      Q.  Do you know whether or not Mr. Olivier
7  led Mr. Bloom to believe that this was a
8  defensible case?
9      A.  I --
10      MR. FRITCHIE:
11           Object to the form.
12      THE WITNESS:
13           I don't know.  I don't know.  You
14  have to ask Mr. Olivier or Mr. Bossier.
15  EXAMINATION BY MR. WARREN:
16      Q.  Do you know whether or not Mr. Olivier
17  believed it was a defensible case?
18      A.  I don't know.
19      Q.  Would that be important to understand
20  in order to know what Mr. Bloom -- what
21  information Mr. Bloom was getting from
22  Mr. Olivier?
23      A.  Yes.
24      Q.  But you didn't take any steps to figure
25  that out?

47 (Pages 185 to 188)

Richard S. Vale
February 26, 2016

Page 189

1     A.  Well, I've talked to Mr. Olivier about
2  his impressions in the case, and I -- I don't
3  think he ever said that he -- he thought it was a
4  defensible case.
5     Q.  Well, I misunderstood you.  I thou- --
6  asked you a minute ago whether you knew whether or
7  not he considered it to be a defensible case, and
8  you said you didn't know.
9           Now are you saying that -- that
10  you know that he thought it was not a defensible
11  case?
12     A.  No, I -- I don't ever remember him
13  saying he thought it was a defensible case.  He
14  remembers --
15        MR. FRITCHIE:
16           Let me -- let me just ask for a
17  clarification 'cause I think we're not
18  communicating here.
19           Can you explain to the witness
20  what you mean by "defensible"?  'Cause I'm not
21  sure y'all are on the same page.
22        THE WITNESS:
23           To win it?
24  EXAMINATION BY MR. WARREN:
25     Q.  Yeah.

Page 190

1     A.  Yeah, I don't think I ever heard in any
2  of my cor- -- in my conferences with Mr. Olivier
3  that he thought he could win the case.
4     Q.  (Affirmative response.)
5     A.  There was chances of winning and
6  losing.
7     Q.  What did he tell you he thought the
8  chances were of losing?
9     A.  He never gave me any percentages.  I
10  think hi- -- his dilemma was that he could never
11  replicate how it happened, so -- in order to
12  explain that it happened differently from the way
13  the plaintiffs were alleging it had happened.  And
14  he felt that was critical to trying to defend the
15  case; to get not only experts to say, "No, it
16  didn't happen the way the plaintiffs said it did,
17  but here's a reasonable explanation as to what
18  happened," that did not cause the jury to believe
19  there was fault on Empire.
20     Q.  You -- you said something earlier about
21  believing that it was the actions of the Duplass
22  firm that caused the motion to strike to be filed?
23     A.  Correct.
24     Q.  What specific actions does Blue
25  Williams believe were taken by the Duplass firm

Page 191

1  that caused the motion to strike to be filed?
2     A.  I think in Alvendi- -- Mr. Alvendia's
3  deposition there was some problems with the
4  Duplass firm cooperating with proceeding with the
5  depositions of defendants' experts, and that was
6  one of the things that finally provoked plaintiffs
7  to file the motion to strike.  'Cause, apparently,
8  up till Duplass firm got the case, Mr. Olivier and
9  Mr. Bart Kelly and Mr. Olivi- -- Alvendia were
10  working well together, and I think had had
11  essential gentlemen's agreements that they were
12  just gonna keep doing and get things done as
13  necessary to get to that trial date.
14     Q.  And you really believe that?
15     A.  And things apparently changed after we
16  were fired.
17     Q.  You really believe that?
18     A.  Yes.
19        MR. FRITCHIE:
20           Objection to the form.
21  EXAMINATION BY MR. WARREN:
22     Q.  Have you review- --
23     A.  Absolutely.
24     Q.  Have you reviewed comments made in
25  writing by Mr. Olivier regarding the actions of

Page 192

1  plaintiffs' lawyers and his belief that they had
2  the Court wired and -- yeah.
3     A.  I don't remember that one.
4     Q.  I don't mean wired as in eavesdropping.
5  I mean --
6     A.  Oh.  Okay.
7     Q.  -- that -- that -- that they had --
8     A.  They had influence over the Court?
9     Q.  Right.
10     A.  Yeah.  Yeah, I was in -- I attended
11  Mr. Olivier's deposition.
12     Q.  Right.
13           And have you read the e-mails back
14  and forth where they couldn't seem to get
15  depositions scheduled, and they were di- -- there
16  were ongoing disputes about deposing experts on
17  Mr. Olivier's watch?
18     A.  I haven't read them, but I recall --
19     Q.  -- discussions.
20     A.  -- having discussions about that.  But
21  at the same time, they were -- they were trying to
22  work together.
23     Q.  And with respect to the Duplass firm,
24  that initial dispute about expert depositions, do
25  you remember how long it took to get it resolved?

48 (Pages 189 to 192)

Richard S. Vale
February 26, 2016

Page 193

1    A.  No.
2        Q.  Is there anything else that you believe
3    that the Duplass firm did or failed to do that
4    caused the filing of the motion to strike?
5        A.  Did or failed to do that caused --
6    well, I think Mr. Alvendia said that he was very
7    pleased when he found out a new law firm was
8    picking up the case three weeks before the trial.
9    That's not -- that's really not implying anything
10   from the Duplass perspective.  But I think that
11   was part of why Mr. Alvendia filed the motion to
12   strike, was, as he said in his deposition, you
13   know, a new firm comes in three weeks before
14   trial; he's just going to start shooting
15   everything he can at them to get leverage on them,
16   which he did.
17       MR. WARREN:
18           I'll object and move to strike the
19   nonresponsive answer.
20   EXAMINATION BY MR. WARREN:
21       Q.  And I'll just ask you again:  Other
22   than this what you -- you understood to be some
23   issue regarding the scheduling of depo- -- expert
24   depositions that you believe might have provoked
25   the filing of the motion to strike, is there

Page 194

1    anything else that the Duplass firm did or failed
2    to do that caused, in your -- in your view, in
3    Blue Williams' view, the filing of the motion to
4    strike?
5        A.  Not that I can recall.
6        Q.  Would you agree with me that --
7        MR. FRITCHIE:
8            That it's late?  Yes.
9        THE WITNESS:
10           I agree with you.  Go ahead.
11       MR. BOSSIER:
12           Not so far.
13       MR. WARREN:
14           He's agreed with me on some
15   things.
16       MR. BOSSIER:
17           Well, that's true.
18   EXAMINATION BY MR. WARREN:
19       Q.  I was just gonna see if you would agree
20   with me that if the Marable action was subject to
21   an arbitration agreement, that it would be better
22   to arbitrate the case than to be in CDC?
23       A.  No.
24       Q.  You think CDC'd be better?
25       A.  I don't know.  Depends on the facts and

Page 195

1    circumstances.
2        Q.  You don't have a position one way or
3    another?
4        A.  That's correct.
5        Q.  Do you know whether there was a form
6    selection clause in the documents executed between
7    Mr. Marable and Empire?
8        A.  The firm is aware that there was a --
9    what you just said or a ticket, but I would defer
10   to Mr. Olivier on the ap- -- on the application
11   of -- of -- and the interpretation of that
12   agreement.
13       Q.  In -- in this case -- and I don't think
14   this is an assumption; I think it's absolutely
15   accurate, and -- and there would be no dispute
16   about it.
17           But I'll just say, if we assume
18   that the sales documents, invoicing or whatever,
19   included arbitration language in it --
20       A.  Okay.
21       Q.  -- would you agree with me that an
22   attorney defending the case that's filed in
23   Orleans Parish would have an obligation to at
24   least consider whether the case was subject to
25   arbitration and discuss that with the client?

Page 196

1        A.  Was it signed by the plaintiffs?
2        Q.  I -- I'm -- I'm -- assume that there's
3    arbitration language in the documents.
4        MR. FRITCHIE:
5            Well, object to the form.  It
6    doesn't give the facts.
7        MR. WARREN:
8            I'm not gonna answer questions.
9        THE WITNESS:
10           Well, fair enough.  Well, if it
11   wasn't signed, I'm -- I'm not sure what e- --
12   evaluation or analysis would need to be done.  If
13   they were signed by the parties, then some
14   evaluation would be necessary.
15   EXAMINATION BY MR. WARREN:
16       Q.  What would that evaluation include?
17       A.  Whether the arbitration agreement
18   applied, and whether it could be enforced, and if
19   it -- and whether or not it could be enforced as
20   to all parties.  Otherwise, you might be in two or
21   three different jurisdictions.  I mean, that's
22   also -- again, that would -- I would defer to
23   Mr. Olivier and Mr. Bossier on -- on how to
24   evaluate whether or not the arbitration clause, if
25   it existed, would apply.

49 (Pages 193 to 196)

Richard S. Vale
February 26, 2016

Page 197

1    Q.  Did -- did Mr. Bossier or Mr. Olivier
2  ever evalu- -- make such an evaluation?
3    A.  The firm wouldn't know that.  You would
4  have to ask Mr. Olivier and Mr. Bossier.
5    Q.  Where do the -- those bills come from
6  that go out to Travelers to pay?
7    A.  Say what?
8    Q.  Where do the bills come from?
9    A.  The bills.
10    Q.  Do -- do -- do Mr. Bossier and
11  Mr. Olivier send their own bills?
12    A.  You mean fee bills?
13    Q.  Yeah.
14    A.  Ah.  Yeah, they go out through the firm
15  to Travelers.
16    Q.  Right.
17        So the firm does know what the
18  lawyers do?
19    A.  No.  Even then, the -- the lawyers are
20  the ones that know what they did, not the firm.
21    Q.  Well, they know what they're billing
22  for?
23    A.  The firm has the bills.  But it
24  would -- again, it would be the attorneys that
25  would know what they were billing for.  Blue

Page 198

1  Williams doesn't practice law.
2    Q.  All right.  If -- if -- if an
3  arbitration analysis is required, would that
4  require some discussion with the client?
5    A.  I don't know.  It would depend on the
6  arbitration clause.
7    Q.  And how would you determine -- you said
8  that arbitration might or might not be better that
9  a -- than CDC.
10        How would you make that
11  determination?
12    A.  Based on the facts of the case.
13    Q.  Assume the case is a horrendous injury
14  case.
15        Would the -- would that have an
16  impact?
17    A.  That would be one of the factors that
18  I -- that I guess should be considered.
19    Q.  In which way would that lean, toward
20  CDC or toward arbitration?
21    A.  I don't know.  Again, you'd have to
22  know the actual facts of the case to decide that.
23    Q.  Are you really serious about that?
24    A.  Yes, I am.
25    Q.  Okay.  And so you're -- you're saying

Page 199

1  on your oath, on behalf of Blue Williams, that
2  you've got a catastrophic injury case that's
3  pending in Orleans Parish, and there is -- let's
4  assume that there is an arbitration provision
5  that's -- applies to this dispute.
6        You would still have a question,
7  in your mind, as to whether arbitration would be
8  better than being in Orleans Parish?
9    MR. FRITCHIE:
10        Objection to the form.
11    THE WITNESS:
12        There'd have to be a whole lot of
13  other factors to that, and the firm would have no
14  opinion without a professional attorney evaluating
15  the entire case in the context of that case.
16  EXAMINATION BY MR. WARREN:
17    Q.  Does Blue Williams take any issue with
18  the conclusion in the January 13 report sent to
19  Peter Bloom that total damages in the case would
20  range from 8 to 13 million?
21    A.  The firm would have no opinion on that.
22  We would defer to Mr. Olivier and Mr. Bossier.
23    Q.  And by the way, that -- that report did
24  not contemplate the amended life care plan.
25  That's -- I'm just being fair with you --

Page 200

1    A.  Fair enough.
2    Q.  -- that's what it says.
3        But you don't take a position one
4  way or another?
5    A.  Correct.
6    Q.  Did -- did you read Mr. Olivier's
7  comments to one of his coworkers that he made in
8  connection with the drafting of the pretrial -- or
9  the trial report was complaints about Mr. --
10    A.  -- Allen?
11    Q.  -- Bossier?  Yeah.
12    A.  I -- no, I don't believe I've read it.
13  But it -- I was here for Mr. Olivier's deposition.
14    Q.  Do -- does Blue Williams take the
15  position that that sort of communications
16  regarding one of the lawyers at the firm are -- is
17  appropriate?
18    A.  No.
19    Q.  You think it's inappropriate?
20    A.  Yes.
21    Q.  Can you explain why one of your
22  attorneys would do something like that?
23    A.  I can't.  But he did in his deposition,
24  and I stand by him.
25    Q.  Was that a -- not a basis for some

50 (Pages 197 to 200)

Richard S. Vale
February 26, 2016

Page 201

1  discipline?
2      A.  Not the -- this is apparently the first
3  time we've seen something like that, and -- and I
4  think it was more of a rant than anything else.
5  And I think he went and apologized to Brian about
6  it, and he spoke from his heart to you about why
7  he did it, so I think it's a -- a dead matter at
8  this point.  He better not do it again.
9      Q.  How are you gonna know?
10     A.  If someone brings it to our attention.
11     Q.  Right.
12     A.  How would I -- else I know.
13         MR. WARREN:
14             Let's take a break, see if we can
15  get wrapped up here.
16         MR. FRITCHIE:
17             Can Brian have a copy of your
18  outline?
19         THE VIDEOGRAPHER:
20             We're off the record.
21         MR. FRITCHIE:
22             So he can prepare.
23         MR. BOSSIER:
24             I would prefer not.
25         THE VIDEOGRAPHER:

Page 202

1              We're off the record.  The time is
2  approximately 3:24 p.m.
3              (Whereupon a recess was taken.)
4          THE VIDEOGRAPHER:
5              We're back on the record.  The
6  time is approximately 3:37 p.m.
7  EXAMINATION BY MR. WARREN:
8      Q.  This is more in the housekeeping
9  department than anything else, but just to follow
10  up on something that we've corresponded --
11         MR. WARREN:
12             #114 -- no.  Well -- oh, here we
13  go.  I'm sorry.  I'm in the wrong notebook.
14             #266.
15  EXAMINATION BY MR. WARREN:
16     Q.  To follow up on an issue that has come
17  up in discovery regarding retention policies for
18  your firm.
19     A.  Okay.
20     Q.  And -- and we asked for that.  You
21  know, it's just a kind of standard deal --
22     A.  (Affirmative response.)
23     Q.  -- where you ask for that kind of
24  information --
25     A.  (Affirmative response.)

Page 203

1      Q.  -- in discovery.  And we were referred
2  to a document, and then we followed up and got a
3  copy of the document, and I'm gonna hand you that
4  document.  It's #156.
5              Is that it?
6      A.  Yeah.
7      Q.  Okay.  So you've it --
8      A.  All right.
9      Q.  Okay.
10         MR. FRITCHIE:
11             You got the --
12         MR. WARREN:
13             She needs one copy.
14         THE WITNESS:
15             That was my second cheat sheet I
16  brought with me.
17         MR. BOSSIER:
18             I'll look off his.
19  EXAMINATION BY MR. WARREN:
20     Q.  Is Exhibit #156 the Blue Williams
21  retention policy?
22     A.  Yes.
23     Q.  Does it address electronically-stored
24  information?
25     A.  No, it does not.

Page 204

1      Q.  Okay.  So you don't have a retention
2  policy for electronically-stored information?
3      A.  As far as I know, it's -- it's still
4  there.
5      Q.  Okay.  So there's no systematic purging
6  of data?
7      A.  As far as I know, no.
8      Q.  Okay.  And -- and you did inquire about
9  that --
10     A.  Yes, I did.
11     Q.  -- before you came here?
12     A.  Yes.
13     Q.  Okay.
14         MR. WARREN:
15             You've been patient with me, and
16  I -- I appreciate that courtesy.
17             And I would tender the witness.
18         MR. FRITCHIE:
19             We have no questions.
20         MR. BOSSIER:
21             Okay.  All right.  I've got --
22  Monday --
23         THE WITNESS:
24             Oh, I thought you were gonna ask
25  me some questions.

51 (Pages 201 to 204)

Richard S. Vale
February 26, 2016

Page 205

1        MR. BOSSIER:
2            No, no, no, no.
3        MR. WARREN:
4            I've got a few.
5            (Whereupon a discussion was held
6    off the record.)
7        THE VIDEOGRAPHER:
8            We're off the record.  The time is
9    approximately 3:39 p.m.
10           (Whereupon a discussion was held
11   off the record.)
12       MR. WARREN:
13           On the written record, we --
14   consistent with our discussions among counsel, we
15   simply -- each side reserves rights relative to
16   the way in which this witness was presented as a
17   corporate representative.
18           (Whereupon the witness was
19   excused.)
20
21
22
23
24
25

Page 206

1        REPORTER'S CERTIFICATE
2
3        This certification is valid only for a
    transcript accompanied by my original signature
4    and original required seal on this page.
         I, CINDY ROGERS LA COUR, CSR, RPR, RMR,
5    Certified Court Reporter, in and for the State of
    Louisiana, as the officer before whom this
6    testimony was taken, do hereby certify that
    RICHARD S. VALE, to whom oath was administered,
7    after having been duly sworn by me upon authority
    R.S. 37:2554, did testify as hereinabove set forth
8    in the foregoing 205 pages; that this testimony
    was reported by me in shorthand reporting method,
9    was prepared and transcribed by me or under my
    personal direction and supervision, and is a true
10   and correct transcript, to the best of my ability
    and understanding; that the transcript has been
11   prepared in compliance with transcript format
    guidelines required by statute or by rules of the
12   board, and that I am informed about the complete
    arrangement, financial or otherwise, with the
13   person or entity making arrangements for
    deposition services; that I have acted in
14   compliance with the prohibition on contractual
    relationships, as defined by Louisiana Code of
15   Civil Procedure Article 1434 and in rules and
    advisory opinions of the board; that I have no
16   actual knowledge of any prohibited employment or
    contractual relationship, direct or indirect,
17   between a court reporting firm and any party
    litigant in this matter, nor is there any such
18   relationship between myself and a party litigant
    in this matter.  I am not related to counsel or
19   the parties herein, nor am I otherwise interested
    in the outcome of this matter.
20
21
22
23       CINDY ROGERS LA COUR, CSR, RPR, RMR
         CERTIFIED COURT REPORTER
24       Louisiana CSR #91032
25

52 (Pages 205 to 206)